## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| VIKRAM BHATIA, D.D.S., JEFFREY CHEN, D.D.S., BRUCE SHERRILL, D.D.S., BROOKHAVEN DENTAL ASSOCIATES, P.C., JOHNS CREEK DENTAL ASSOCIATES, P.C., on Behalf of Themselves and All Others Similarly Situated, | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| 3M COMPANY, | |
| Defendant. | |

Plaintiffs Vikram Bhatia, D.D.S, Jeffrey Chen, D.D.S., Bruce Sherrill, D.D.S., Brookhaven Dental Associates, P.C., and Johns Creek Dental Associates, P.C., by and through their undersigned attorneys, file this original class action complaint, both individually and on behalf of a class of all those similarly situated.

### NATURE OF THE ACTION

1. This case involves hundreds of thousands of defective dental crowns that Defendant 3M Company and through its subsidiary division 3M ESPE ("3M") aggressively marketed and sold to dentists around the country. 3M represented that its Lava™ Ultimate Restorative ("Lava Ultimate") provided dentists and patients with a combination of aesthetics and durability that had previously been unavailable in

1

restorations that were done "chairside"—*i.e.*, at the dentist's office and during a single visit.  Lava Ultimate, however, failed at an alarming rate.  Plaintiffs experienced debond rates that were orders of magnitude higher than those seen in any other product.  In fact, dentists around the country have reported failure rates up to 50%.

2.      Lava Ultimate is a defective product as evidenced by these high failure rates; specifically, Lava Ultimate is defective because of the manner in which the crown flexes when under pressure and its failure to accept affixation through recommended bonding or cementation procedures.  Despite its knowledge of the defect and the unacceptable debond rate, 3M continued to tout Lava Ultimate's durability for crowns. 3M engaged in a widespread marketing campaign that advertised the durability of Lava Ultimate and its appropriateness for crowns.  3M continued this campaign despite its knowledge of Lava Ultimate's defects, and 3M reaped substantial profits by not disclosing the product's defects.  When faced with dentist complaints that Lava Ultimate was defective, 3M, rather than accept responsibility and acknowledge the defect, chose to blame the dentists' techniques for Lava Ultimate's unacceptable debond rates.

3.      *Finally*, on June 12, 2015, 3M admitted that Lava Ultimate was defective and inappropriate for restorative crowns—a fact that it had known for years, yet failed to disclose for self-serving reasons.

4.      Plaintiffs, individually and on behalf of all others similarly situated, now seek an award of damages, disgorgement of profits, and any other appropriate relief that they are due because of 3M's unlawful conduct.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; the aggregate amount in controversy exceeds $5,000,000; and minimal diversity exists.

6.     This Court has personal jurisdiction over 3M because the company maintains its principal place of business in St. Paul, Minnesota, regularly conducts business in Minnesota, and has sufficient minimum contacts with Minnesota. 3M intentionally avails itself of this jurisdiction by marketing and selling products, including Lava Ultimate, from Minnesota.

7.     Venue is proper in this District under 28 U.S.C. § 1391 because 3M resides in the District, a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and 3M has caused harm to class members residing in this District.

## PARTIES

8.     Plaintiff Vikram Bhatia, D.D.S., is a resident and citizen of Georgia. Dr. Bhatia purchased Lava Ultimate products for use in dental crowns and indeed used Lava Ultimate for his patients' dental crowns.

9.     Plaintiff Jeffrey Chen, D.D.S., is a resident and citizen of Georgia. Dr. Chen purchased Lava Ultimate products for use in dental crowns and indeed used Lava Ultimate for his patients' dental crowns.

10.     Plaintiff Bruce Sherrill, D.D.S., is a resident and citizen of Texas. Dr. Sherrill purchased Lava Ultimate products for use in dental crowns and indeed used Lava Ultimate for his patients' dental crowns.

11.     Plaintiff Brookhaven Dental Associates, P.C., is a professional corporation organized under the laws of Georgia, with its principal place of business at 1407 Dresden Dr., Suite 200, Atlanta, GA, 30319.

12.     Plaintiff Johns Creek Dental Associates, P.C., is a professional corporation organized under the laws of Georgia, with its principal place of business at 10305 Medlock Bridge Road B3, Johns Creek, GA, 30097.

13.     Defendant 3M is a corporation doing business in every U.S. state, the District of Columbia, and territories of the U.S. 3M is organized under the laws of Delaware, with its principal place of business at 3M Center, St. Paul, Minnesota, where 3M makes decisions about the research, development, marketing, and sale of its products, including Lava Ultimate.

## FACTUAL ALLEGATIONS

### A.     Dental Restorations

14.     A dental restoration consists of material used to restore the function, integrity, and morphology of missing tooth structure. Restorations range from small fillings to larger procedures like crowns and bridges. Generally, a restoration (and the material from which it is created) should be durable, aesthetically pleasing, and efficient to manufacture. And ideally, the application process should cause minimal pain and inconvenience to the patient. Since the advent of modern dentistry in the mid-1900s,

4

dentists have sought a single restoration material that can be used for a broad range of dental procedures. Finding such a material, has proven elusive.

15.     Because no single restoration material possessed all the qualities noted above, dentists had to choose between different materials and methods depending on the restoration that the patient required.

16.     Fillings and small cavities, for example, are "direct restorations" a dentist can fabricate the restoration directly inside the patients' mouth. Direct restorations are relatively convenient for patients because a dentist performs the restoration "chairside." In other words, the dentist places, cures, and shapes the restoration material in the patient's mouth during a single sitting.

17.     But as damage to the tooth becomes more extensive, placing, curing, and shaping the restoration directly inside a patient's mouth becomes impossible or impractical. In these cases, "indirect restorations" are done, in which the dentist fabricates the restoration outside the patient's mouth. Depending on the extent and location of damage, a dentist may bond a unique inlay, onlay, veneer, or crown to the patient's existing tooth structure. A veneer can be placed on the surface of a tooth to protect it from damage, but it is generally used only for aesthetic purposes. Dental inlays and onlays are indirect restorations for moderate tooth damage. Inlays fill the space in the center of the tooth between the rounded edges of the tooth, and onlays cover the edges of the tooth.

18.     In some cases, a tooth is too damaged for an inlay or an onlay. If, for example, a patient has a large cavity, fractured her tooth, or needs a root canal, the patient

may require a dental full crown, which is sometimes referred to as a "prosthetic crown." A dental crown is a tooth-shaped cap that completely covers a tooth or dental implant.

19.     In the past, patients receiving dental crowns typically had to make two visits (or occasionally more) to the dentist. Multiple trips were necessary because dentists could not shape, place, and cure the crown chairside during a single sitting. A patient would first go to the dentist for an initial visit where the dentist would create a molding or impression of the damaged tooth. The dentist would fit the patient with a temporary prosthetic crown that would last until the patient returned for a subsequent visit.

20.     The dentist would send that molding or impression to an off-site laboratory that would cast and shape the prosthetic crown. The laboratory technician had to take great care in shaping the prosthetic to ensure that the crown would bond correctly to the tooth structure and fit properly with the patient's gums and other teeth. Laboratory technicians usually cast the prosthetic in metal, so if the patient wanted an aesthetically pleasing tooth, the laboratory technician would have to go through the time-consuming process of incrementally placing and baking ceramic material onto the prosthetic.

21.     During the patient's subsequent visit, the dentist would fit and cement or otherwise bond the prosthetic crown to the patient's existing tooth.

22.     This two-step process has multiple disadvantages. First, it is difficult to take an accurate impression of the patient's tooth, and the fabricating process is extremely labor intensive. As a result, there is a high potential for human error. Further, patients have to undergo different dental procedures over the course of separate office visits—doubling

the time the patient has to endure the discomfort from the dental work and sedation as well as increasing the inconvenience and expense of multiple trips to the dentist.

**B.** **Dentists begin to use computer-assisted restorations to reduce the time to create crowns and other indirect restorations.**

23.     To overcome the limitations of indirect restorations, scientists in the early 1980s implemented computer-aided design and computer aided manufacturing ("CAD/CAM") restorations. CAD/CAM restorations involve taking digital impressions of the tooth and mouth using different types of scans. Proprietary software analyzes these scans and then creates a design that is sent to a machine that mills or prints a three-dimensional prosthetic tooth.

24.     Although CAD/CAM restorations reduced human error in the fabrication process, they did not materially improve on the traditional two-visit indirect restoration process that dentists had traditionally used. Early CAD/CAM shaping and curing still had to be done off-site because the machines milled the crown were too big to fit in an office. Consequently, dental crowns in most cases still could not be created "chairside," and patients still had to make separate visits to the dentist for the fitting and bonding portions of the procedure.

25.     A breakthrough occurred, however, in the mid-1980s when Professor Werner H. Mörmann and Dr. Marco Brandestini developed the Chairside Economical Restoration of Esthetic Ceramics ("CEREC"). As the name suggests, CEREC allows dentists to construct, produce, and insert indirect restorations chairside in a single

appointment. As of October 2013, around 38,000 dentists worldwide use CEREC to produce around 6.9 million restorations each year.

26.     But despite the technological leaps that accomplished through CEREC machines, there were still problems because the materials that were compatible with the CEREC machine could not be used across a wide spectrum of restorations. Early CEREC inlays, onlays, veneers, and crowns were made out of ceramics. Glass ceramics are weaker materials that are susceptible to chipping, but they are convenient because dentists can mill them chairside using a CEREC machine in a relatively short time period. Zirconia restorations, on the other hand, are extremely durable and fracture-resistant, which enables multi-tooth restorations; however, the material requires a long strengthening procedure, which makes chairside production impractical in most cases.

27.     Because no single restoration material addressed the wide variety of issues that dentists face, dentists had to purchase numerous types of restoration material, many of which required different techniques for creation and application.

### C.     3M Introduces Lava Ultimate

28.     3M introduced Lava Ultimate as a chairside solution to the problems dentists faced in performing indirect restorations.  3M sought and obtained clearance from the Food and Drug Administration ("FDA") to market Lava Ultimate under Section 510(k) of the Medical Device Amendment to the Food, Drug, and Cosmetics Act.

29.     Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28,

1976.  No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to the products.

30.    3M's application to the FDA for 510(k) approval described Lava Ultimate as "a strong, wear-resistant and highly esthetic mill block that provides a fast and easy to use alternative to porcelain blocks" and indicates that is should be used for "inlays, onlays, veneers, and *full crown restorations, including crowns on implants*." (emphasis added)

31.    In a January 2011 letter, the FDA determined that Lava Ultimate was "substantially equivalent" and allowed it to be legally marketed "subject to the general controls provisions of the Act."   The 2011 letter from the FDA further classified Lava Ultimate as a Class II medical device and advised that 3M "must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events (21 CFR Part 820)."

32.    Following FDA approval 3M launched Lava Ultimate in or around 2011. 3M pitched Lava Ultimate as durable enough for use in any type of restoration, convenient enough to be milled chairside, and aesthetically pleasing to patients and dentists alike.  As a result, 3M marketed Lava Ultimate as suitable for many types of indirect dental restorations, including crowns.

33.    3M stated that Lava Ultimate was fracture resistant like a composite, aesthetically pleasing like a ceramic, and able to be milled chairside. Specifically, 3M described Lava Ultimate as, "A resin nano ceramic [that] has an elastic modulus that's comparable to dentin—which is much lower than what brittle glass ceramic materials or

PFM veneering porcelains provide. This enables Lava Ultimate Restorative to better absorb chewing forces and reduce stress to the CAD/CAM restoration."[1] 3M represented that Lava Ultimate's elasticity allows it to better "give way" as compared to glass ceramic materials, which supposedly increased durability. In addition, 3M proclaimed that Lava Ultimate has better "bounce back" and absorbs more stress without suffering permanent deformation or failure. 3M also marketed Lava Ultimate as being gentle to other teeth in the mouth.

34.     In addition to the characteristics noted above, 3M also marketed Lava Ultimate as being more economic than the industry leading "E-Max" crown from Ivoclar Vivadent.

35.     Based on 3M's representations and aggressive marketing, Plaintiffs and the class members purchased 3M's Lava Ultimate product for use in dental crowns.

**D.     3M's Lava Ultimate contains a defect resulting in a shockingly high failure rate when the material is used in crowns.**

36.     Shortly after hitting the market in 2011, prosthetic crowns made using Lava Ultimate began debonding at an alarming rate.  The debonding failures were due to defects in Lava Ultimate. Lava Ultimate exhibits poor bond strength in general, irrespective of the different application protocols that 3M recommended.  The poor bond strength was exacerbated by, among other things, the material's flexibility. All of 3M's Lava Ultimate products have this defect. And only 3M had access to the information about

---

[1] "Lava Ultimate Lab Brochure," http://jensendental.com/wp-content/uploads/2015/04/Lava-Ultimate-Lab-Brochure.pdf (last visited on May 6, 2016).

the products' high debond and failure rate. 3M failed to disclose, at and after the time of purchase, that Lava Ultimate was defective and not fit for use in crowns.

37.     For example, Lava Ultimate is packaged in a sealed box with labeling on the outside. 3M placed warnings and/or instructions on the outside of the box. These packages, however, did not warn or otherwise inform Plaintiffs and Class Members about the high debond rates or the inappropriateness of Lava Ultimate for use in crowns. Each package in which Lava Ultimate was sent was defective and contained material omissions concerning the label's failure to note the unreasonably high rate of debonding due to the materials flex.

38.     3M failed to warn Plaintiffs and the Class despite having knowledge about Lava Ultimate's propensity for unreasonably high debond rates when the material was used in crowns. This deception and withholding of internal information in the face of communications from dentists around the country complaining about the high failure rate continued until June 12, 2015, when 3M finally acknowledged that the high rate of debonds made Lava Ultimate unacceptable for use in crowns. 3M's marketing and statements prior to June 12, 2015 were knowingly and intentionally false; 3M intended to deceive Plaintiffs and the Class into believing that Lava Ultimate was an effective material for crowns, when in fact 3M knew it was a defective product that resulted in harm to dentists and patients.

39.     For example, in Lava Ultimate's Technical Product Profile, 3M indicated that Lava Ultimate could be used for "[p]ermanent, adhesive, single-tooth restorations including crowns [and] crowns over implants."

11

40.     Similarly, in a 2012 brochure, 3M represented that Lava Ultimate's "innovative characteristics make it especially impressive for implant-supported crowns. And it's reliable in that tough role, just imagine how it will perform in other challenging single-unit indications." As an example of a single-unit application in which Lava Ultimate excels, 3M specifically lists crowns.

41.     Consistent with 3M's refusal to acknowledge Lava Ultimate's defects, when one dentist complained to 3M about the abnormally large number of Lava Ultimate debonds, 3M represented that "[w]e have no reason to believe that our materials were defective."

42.     Plaintiffs and the Class had no knowledge and no effective way to know that Lava Ultimate was defective. And had Plaintiffs and the class known of Lava Ultimate's defect, they would not have purchased the material or not used the material for crowns.

**E.     3M finally acknowledges the failure of its product and instructs dentists to stop using Lava Ultimate for crowns.**

43.     3M initially tried to place the blame for the high debond rate of Lava Ultimate on dentists by suggesting that the crowns were applied improperly. 3M updated the guidelines for installing crowns made with Lava Ultimate. But, unsurprisingly, the updated installation protocols did not solve the debond problem; regardless of the installation method, crowns made with Lava Ultimate continued to debond at an alarming rate.

44.     On June 12, 2015, 3M issued a new protocol for the use of Lava Ultimate and finally acknowledged that Lava Ultimate was not appropriate for crowns. 3M sent a

letter to dentists stating that Lava Ultimate should no longer be used for dental crowns. The letter stated: "3M Oral Care is removing the crown indication for Lava Ultimate CAD/CAM Restorative Product because crowns are debonding at a higher-than anticipated rate . . . ." In bold print, 3M sent the following warning:

> **IMPORTANT: Do not use Lava Ultimate restorative for any type of crown because there exists a potential for debonding.**

45.     On June 15, 2015, the FDA classified 3M's letter to dentists as a Class II recall. A Class II recall is defined as:  a situation in which use of, or exposure to, a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote.

46.     At the time of the recall, 3M had distributed over 1 million of these defective products.[2]

**F.     Lava Ultimate's defects harm dentists.**

47.     Because patients correctly expect that they should not bear the repair costs associated with a defective crown, dentists must bear the costs of Lava Ultimate's defects. This is especially problematic because often times a crown debonding is considered an emergency event that requires prompt attention. The dentist must:

- x-ray the patient,
- administer anesthetic to the patient,
- clean the old crown,
- re-clean and prep the tooth, and
- reapply the bonding agent.

---

[2] FDA Enforcement Report – Week of July 15, 2015, https://www.accessdata.fda.gov/scripts/enforcement/ enforce_rpt -Product-Tabs.cfm?action=select&recall_number=Z -2052-2015&w=07152015&lang=eng (last visited May 6, 2016).

13

48.     In addition, many patients require sedation, which further increases the costs to the dentist.

49.     In a significant number of incidents, dentists have had to replace the restoration with a new crown with all the attendant time, inconvenience, material and labor costs, and loss of good will incurred by the dentists

50.     Repairing a failed Lava Ultimate crown typically takes at least two hours. 3M does not compensate dentists for the cost of their materials or the time spent repairing the failed crowns.  Dentists are forced to bear the cost of replacement alone.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this lawsuit as a class action on behalf of themselves, and all others similarly situated as members of the proposed class, under Federal Rules of Civil Procedure 23(a) and (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

52.     The Class is defined as:

>   All dentists or corporate dental practices in the United States, Commonwealth of Puerto Rico, U.S. Virgin Islands, and Guam who purchased and/or used 3M's Lava™ Ultimate Restorative.

53.     Excluded from the Class are the defendant, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

14

54.    **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, 3M sold and/or distributed over 1 million Lava Ultimate products, and the number of class members is likely in the thousands. Joinder under such numbers is impracticable. The disposition of the claims of the class in a single action will provide substantial benefits to all parties and to the Court. Further, the Class Members are readily identifiable from information and records in 3M's possession, custody, or control.

55.    **Typicality:** The representative plaintiffs' claims are typical of the claims of the Class Members in that the representative plaintiffs, like all Class Members, purchased a common product—Lava Ultimate—made from a common engineering and manufacturing process.  The defect and susceptibility to debonding in Lava Ultimate products Plaintiffs purchased is typical of the defects that the Class experienced. Moreover, Plaintiffs, like all Class Members, purchased Lava Ultimate in a transaction that was part of 3M's coordinated marketing effort, which was comprised of common representations about Lava Ultimate.

56.    **Commonality**: There are numerous questions of law and fact common to Plaintiffs and the Class Members, and those issues predominate over any question affecting only individual Class Members. The common legal and factual issues include the following:

a.   Whether Lava Ultimate was defective;

b.   Whether Lava Ultimate debonded at an abnormally high rate;

c.   Whether 3M knew about the defect before June 12, 2015 and, if so, how long 3M knew about the defect;

15

d.   Whether the defective nature of Lava Ultimate constitutes a material fact to a reasonable dentist purchasing restorative material for crowns;

e.   Whether 3M had a duty to disclose the defective nature of Lava Ultimate;

f.   Whether 3M breached implied or express warranties;

g.   Whether 3M engaged in conduct that violated Minnesota's consumer protection statutes—including the Minnesota Prevention of Consumer Fraud Act and the Minnesota Uniform Deceptive Trade Practices Act;

h.   Whether Plaintiffs and the class members are entitled to equitable relief, including declaratory relief; and

i.   Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

57.   **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

**Certification under Federal Rule of Civil Procedure 23(b)(3): Superiority and Predominance.**

58.   Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of 3M's wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in

this complaint. This class action likely presents no difficulties in management that would preclude maintenance as a class action.

## TOLLING OF THE STATUTE OF LIMITATIONS

59.     Plaintiffs and Class Members had no realistic opportunity to know that Lava Ultimate was defective and suffered from an abnormally high number of debonds until June 12, 2015—the date on which 3M issued the statement that Lava Ultimate was unsuitable for crowns—and thereafter as patients with existing restorations continue to present with debonding emergencies. In addition, despite their due diligence, Plaintiffs and the Class could not reasonably have expected to learn or discover that 3M concealed material information about Lava Ultimate until June 12, 2015.

60.     3M's knowledge and active concealment of the defect has tolled any applicable statute of limitation. 3M is estopped from relying on any statute of limitation because the company concealed knowledge about Lava Ultimate's true characteristics.

61.     Because the Plaintiffs and the Class could not have reasonably known about the factual basis for their claims until (at the earliest) the date on which 3M issued the statement that Lava Ultimate suffered from an abnormally large number of debonds, accrual of their claims did not begin (at the earliest) until June 12, 2015.

## CAUSES OF ACTION

**Count 1:      Breach of Express Warranty (Minn. Stat. §§ 336.2-313 & 336.2a-210)**

62.     Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Class Members.

63.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate Product under Minn. Stat. § 336.2-104(1) and a "seller" of Lava Ultimate under § 336.2-103(1)(d).

64.    Lava Ultimate is and was at all relevant times a "good" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

65.    In connection with the purchase or sale of each Lava Ultimate product, provided an express warranty for a period for a period of 10 years.

66.    Plaintiffs and Class Members experience defects within the warranty period. Despite the existence of these warranties, 3M failed to inform Plaintiffs or the Class Members about the defects in Lava Ultimate until June 12, 2015, and failed to remedy the defective crowns free of charge.

67.    In addition, 3M also expressly warranted that Lava Ultimate was appropriate for crowns, stating that "its innovative characteristics make it especially impressive for implant-supported crowns." 3M stated that Lava Ultimate is "reliable" and had "impressive durability" with "excellent resiliency." 3M made these representations above a graphic showing Lava Ultimate being used for a crown. According to 3M's marketing materials, Lava Ultimate's "high flextural strength (200 MPa) adds to posterior restoration."

68.    3M's warranties formed a basis of the bargain that was reached when Plaintiffs and Class Members purchased Lava Ultimate.

69.    Allowing 3M reasonable opportunity to cure its breach of written warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate

debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the warranty on the crowns fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

70.     Therefore, Plaintiffs and Class Members' recovery is not restricted to any aspect of the warranty promising to repair and/or correct a manufacturing defect, and such a limited remedy would not make Plaintiff or the Class whole. Plaintiffs and the Class therefore seek all remedies allowed by law.

71.     Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. And 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

72.     Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Class Members of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

73.     3M was provided notice of these issues by numerous complaints that dentists made against them. 3M settled many of these disputes before litigation was commenced. The current complaint also provides notice to 3M.

74.     As a direct and proximate result of 3M's breach of express warranties, Plaintiff and the Class Members have been damaged in an amount to be determined at trial.

**Count 2:        Breach of Implied Warranty (Minn. Stat. §§ 336.2-314 and 336.2A-212)**

75.     Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Class Members.

76.     3M is and was at all relevant times a "merchant" with respect to Lava Ultimate products under Minn. Stat. § 336.2-104(1) and "sellers" of Lava Ultimate under § 336.2-103(1)(d).

77.     Lava Ultimate is and was at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

78.     A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

79.     Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiff and Class Members.

80.     3M was provided notice of these issues by the instant complaint and numerous letters and communications that Plaintiffs and/or Class Members sent 3M.

20

81.     As a direct and proximate result of 3M's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count 3:     Violation of Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. § 325d.43-48, *et seq*)**

82.     The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44.

83.     In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false, or deceptive acts that violated the Minnesota DTPA. By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the Minnesota DTPA.

84.     3M's actions as set forth above occurred in the conduct of trade or commerce.

85.     In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

86.     3M knew the true nature of Lava Ultimate's high debond rate since well before it publically acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

87.     3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

88.     3M knew or should have known that its conduct violated the Minnesota DTPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

89.     Plaintiff and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true

nature had been disclosed, or would have paid significantly less for it. Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

90.     Pursuant to Minn. Stat. § 8.31(3a) Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA. This action will achieve a public benefit. The misrepresentations by 3M was significant and directly contributed to the harm suffered by Plaintiffs and Class Members. The misrepresentations were made to increase profits at the expense of Plaintiffs and their patients. Plaintiffs and Class Members seek monetary and injunctive relief, in order to stop further damage to the business of dentists throughout the country.

91.     In the alternative, pursuant to Minn. Stat. § 325D.45, Plaintiffs and Class Members are likely to be harmed going forward by the sale and distribution of Lava products. 3M has attempted to inform the public that Lava Ultimate cannot be used for crowns; however, it is still sold for inlays and onlays putting Plaintiffs at risk if they have not yet been informed of the potential dangers of Lava Ultimate. The only way to adequately stop 3M from harming plaintiffs is through injunctive relief. 3M willfully engaged in deceptive trade practices in violation of the DTPA, and as a result, Plaintiffs and Class Members are entitled to costs and attorneys' fees.

**Count 4:     Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325f.68, *et seq.*)**

92.     Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Class Members.

93.     3M's Lava Ultimate constitutes "merchandise" within the meaning of Minn. Stat. § 325F.68(2). The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise."

94.     The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1). 3M participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

95.     In the course of their business, 3M concealed and suppressed material facts concerning Lava Ultimate. 3M did this by failing to disclose the high rate of Lava Ultimate debonds as well as admit that Lava Ultimate had defects that led to such debonds. Plaintiffs and the Class had no way of discerning that 3M's representations about Lava Ultimate were false and misleading. 3M's conduct constituted misleading, false, unfair or deceptive acts or practices that violated the Minnesota CFA. 3M knew or should have known that its conduct violated the Minnesota CFA, and 3M owed Plaintiffs and the Class a duty to disclose the defects.

96.     3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics of Lava Ultimate, including the high debond rate. Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations about the

characteristics of Lava Ultimate. Indeed, Plaintiffs and the Class would not have purchased Lava Ultimate for crowns if the product's true nature had been disclosed, or would have paid significantly less for the product than they did.

97. 3M's unlawful acts and practices complained of herein affect the public interest. As a direct and proximate result of 3M's violations of the Minnesota CFA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage. Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA. Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that 3M's acts show deliberate disregard for the rights or safety of others. Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA. This action will achieve a public benefit. The misrepresentations by 3M was significant and directly contributed to the harm suffered by Plaintiffs. The misrepresentations were made to increase profits at the expense of Plaintiffs and their patients. Plaintiffs seek monetary and injunctive relief, in order to stop further damage to the business of dentists throughout the country.

98. In the alternative, pursuant to Minn. Stat. § 325F.70, Plaintiffs request that this Court enjoin Defendant from engaging in misrepresentation and deceptive practices.

**Count 5: Indemnity based on Products Liability**

99. Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Class Members.

100.     Manufacturers are held strictly liable for defects. Plaintiffs, on behalf of themselves and the Class Members, seek indemnity from 3M for damages Plaintiffs have suffered and will suffer as a consequence of the defectively designed Lava Ultimate.

**Count 6:       Strict Liability – Design Defect**

101.     Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Class Members.

102.     Lava Ultimate was not reasonably safe or effective for its intended uses and were defective as described herein with respect to their design.  As previously stated, Lava Ultimate's design defects include, but are not limited to:

     a.   Failure to achieve a sufficient bond strength;

     b.   Failure to maintain sufficient bond strength; and

     c.   Flex in the material that contributed to the reduction in bond strength.

103.     As a direct and proximate result of the aforementioned defects in Lava Ultimate, Plaintiffs and Class Members have experienced and continues to experience financial or economic loss, as well as damage to their professional reputation and business practice.

104.     3M is strictly liable to Plaintiffs and the Class Members for designing, manufacturing, marketing, labeling, packaging and selling defective products.

**Count 7:       Strict Liability – Manufacturing Defect:**

105.     Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Class Members.

26

106.    Lava Ultimate was not reasonably safe for its intended uses and was defective as described herein as a matter of law with respect to their manufacture, in that they deviated materially from 3M's design and manufacturing specifications in such a manner as to pose unreasonable risks of failure requiring replacement.

107.    Lava Ultimate reached Plaintiffs and the Class without substantial change or adjustment to their function upon being applied.

108.    3M knew or should have known of the manufacturing defects and the risk of failure that exceeded the benefits associated with Lava Ultimate.

109.    Furthermore, Lava Ultimate and its related defects presented an unreasonable risk beyond what the ordinary consumer would reasonably expect.

110.    Lava Ultimate is inherently dangerous for its intended use due to manufacturing defects and improper functioning.  3M is therefore strictly liable.

111.    As a direct and proximate result of the defects in Lava Ultimate, Plaintiffs and the Class Members have experienced and continue to experience financial or economic loss, as well as damage to their professional reputation and business practice.

112.    3M is strictly liable to Plaintiffs and the Class Members for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

**Count 8:    Strict Liability – Failure to Warn**

113.    Plaintiffs incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

114.    3M's Lava Ultimate was not reasonably safe for its intended uses and was defective as described herein as a matter of law due to their lack of appropriate and

necessary warnings.  Specifically, 3M did not provide sufficient or adequate warnings regarding, among other subjects, the product's propensity to debond.

115.    As a direct and proximate result of the defective Lava Ultimate, Plaintiffs and the Class Members have experienced and continue to experience financial or economic loss, as well as damage to their professional reputation and business practice.

116.    3M is strictly liable to Plaintiffs and Class Members for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

**Count 9:        Unjust Enrichment**

117.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Class Members.

118.    3M has benefitted from selling at an unjust profit defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, Plaintiffs and the Class overpaid for Lava Ultimate.

119.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

120.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

121.    3M knowingly accepted the unjust benefits of its fraudulent conduct and other misconduct.

122.    As a result of 3M's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the class in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, respectfully request as follows:

A.    An order determining this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.    An order designating Plaintiffs as the named representatives of the class, and the appointment of the undersigned as Class Counsel;

C.    Judgement temporarily and permanently enjoining 3M from continuing the unlawful, deceptive, fraudulent, harmful and unfair business conduct and practices alleged in this complaint;

D.    Judgement temporarily and permanently enjoining 3M from continuing to sell, market or distribute Lava products for use in crowns;

E.    Judgement against 3M in favor of Plaintiffs and Class Members;

F.    Any and all applicable statutory and civil penalties;

G.    An order requiring 3M to pay both pre- and post-judgment interest on any amounts awarded;

H.    An award of costs and attorneys' fees, as allowed by law;

I.    Leave to amend this Complaint to conform to the evidence produced at trial; and

J.    Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs requests a jury trial on all matters so triable.

Dated: May 16, 2016                    Respectfully submitted,

**GUSTAFSON GLUEK PLLC**

*s/Daniel C. Hedlund*
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Amanda M. Williams (#341691)
David A. Goodwin (#386715)
Eric S. Taubel (#0392491)
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail:  dgustafson@gustafsongluek.com
        dhedlund@gustafsongluek.com
        awilliams@gustafsongluek.com
        dgoodwin@gustafsongluek.com
        etaubel@gustafsongluek.com

Warren T. Burns
TX State Bar No. 24053119
Will Thompson
TX State Bar No. 24094981
**BURNS CHAREST LLP**
500 North Akard, Suite 2810
Dallas, TX 75201

Telephone: (469) 904-4550
Facsimile: (469) 444-5002
E-mail:  wburns@burnscharest.com
         wthompson@burnscharest.com


Korey A. Nelson
LA State Bar No. 30002
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
E-mail:  knelson@burnscharest.com


Charles D. Gabriel
GA Bar No. 281649
**CHALMERS PAK, BURCH & ADAMS,
LLC**
North Fulton Satellite Office
5755 North Point Parkway, Suite 96
Alpharetta, GA 30097
Direct: (678) 735-5903
Facsimile: (678) 735-5905
Email:   cdgabriel@cpblawgroup.com


David S. Corwin #38360MO
Bradley A. Winters #29867MO
Vicki L. Little, #36012MO
**SHER CORWIN WINTERS LLC**
190 Carondelet Plaza, Suite 1100
St. Louis, Mo. 63105
Telephone: (314) 721-5200
Facsimile: (314) 721-5201
E-mail:  dcorwin@scwstl.com
         bwinters@scwstl.com
         vlittle@scwstl.com

31