## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| VIKRAM BHATIA, D.D.S., et al. on behalf of themselves and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>3M Company,<br><br>　　　　　　Defendant. | Case No. 0:16-cv-01304-DWF-TNL<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs bring this action on behalf of themselves and all others similarly situated, and file this consolidated class action complaint against the 3M Company. Plaintiffs allege the following based on information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

### NATURE OF THE ACTION

1.      This case involves over a million defective dental crown products that Defendant 3M Company, by and through its subsidiary division 3M ESPE (collectively "3M"), aggressively marketed and sold to dentists around the country. 3M represented that its Lava™ Ultimate Restorative product ("Lava Ultimate") provided dentists and patients with a crown material that had a combination of aesthetics and durability that had previously been unavailable in restorations that were created "chairside"—*i.e.*, at the dentist's office —during a single visit. But the Lava Ultimate crowns that Plaintiffs and the class members purchased and applied failed at rates that were orders of magnitude higher than those seen

43634

1

in any other crown material. The shockingly high failure rates were due to an inherent defect in Lava Ultimate, which made the product inappropriate for the uses for which 3M had previously represented—in particular, Lava Ultimate's use in dental crowns. All Lava Ultimate crowns contain this inherent defect.

2.     Lava Ultimate is inherently defective because it loses its adhesive properties after being exposed to temperature fluctuations that are present in every patient's mouth. When exposed to such fluctuations, the perimeter of the Lava Ultimate crown contracts and moves inward, resulting in a dimensional change in the crown. As a result of the crown's dimensional changes, the crown is subjected to additional tensile stress, which weakens the bond between the crown and tooth. Eventually, this weakening causes the crown to separate (or "pop off") from the tooth. All of 3M's Lava Ultimate products have this inherent defect.

3.     Dentists complained and told 3M about the numerous debonding failures their patients experienced associated with Lava Ultimate crowns, which 3M's own internal documents confirm. Despite its knowledge of the inherent defect and the unacceptably high debond rate, however, 3M continued to tout Lava Ultimate for crown use and engaged in a widespread marketing campaign that advertised the purported durability, appropriateness, and superiority of Lava Ultimate for crowns.

4.     When faced with dentists' complaints that Lava Ultimate was defective and debonding, rather than accept responsibility and acknowledge the defect, 3M also chose to blame the dentists' techniques. 3M then advocated different installation protocols, but none addressed the underlying problem or reduced the number of debonds. Despite the failures,

43634

2

3M continued to reap substantial profits by continuing to advertise and sell Lava Ultimate for use in crowns. 3M continued its advertising campaign despite its knowledge about Lava Ultimate's defects. In reliance on 3M's representations, dentists, through no fault of their own because they were unaware of the defect, continued purchasing Lava Ultimate for use in crowns.

5.     On June 12, 2015, 3M *finally* admitted that Lava Ultimate was inherently defective and inappropriate for crowns—a fact that it had known for years, yet failed to disclose for self-serving reasons. 3M has refused to reimburse the thousands of dentists who have been forced to install new crowns after Lava Ultimate failures occurred. Dentists have instead been forced to pay out of their own pockets for the costs associated with replacing 3M's defective materials.

6.     Plaintiffs, individually and on behalf of all others similarly situated, now seek an award of damages, disgorgement of profits, and any other appropriate relief that they are due as a result of 3M's unlawful conduct described herein.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because minimal diversity exists as at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; and the aggregate amount in controversy exceeds $5,000,000.

8.     This Court has personal jurisdiction over 3M because the company maintains its principal place of business in Maplewood, Minnesota, regularly conducts business in

43634

Minnesota, and has sufficient minimum contacts with Minnesota. 3M intentionally avails itself of this jurisdiction by marketing and selling products, including Lava Ultimate, from Minnesota.

9.     Venue is proper in this District under 28 U.S.C. § 1391 because 3M resides in the District, a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and 3M has caused harm to class members residing in this District.

**PARTIES**

10.     For ease of reference, the following chart identifies the class representatives by state and the causes of action they bring on behalf of themselves and the members of the alternative state classes.[1]

| Plaintiffs | State | Causes of Action | |
|---|---|---|---|
| Angela Ferrari, D.D.S., Angela M. Ferrari, D.D.S., Inc., Edward Shapiro, D.D.S., Pacific Holistic Dental, Inc., Jerry Yu, D.D.S.,  and Jerry Yu Dental Corp. d/b/a Grand Avenue Smiles | California | Count I. | Violations of the Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*) |
| | | Count I. | Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) |
| | | Count II. | Violation of California False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et. seq.*) |
| | | Count III. | Violation of Song-Beverly Consumer Warranty Act for Breach of Express |

---

[1] In the event the Court does not certify a nationwide class, but rather certifies the state subclasses, each subclass asserts damages arising under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq* as pled in Count VI of the Nationwide Class (Or Alternative Minnesota State Subclass) section below.

43634

| | | | |
|---|---|---|---|
| | | | Warranties (Cal. Civ. Code §§ 1791.2 & 1793.2(d)) |
| | | **Count IV.** | Breach of Express Warranty (Cal. Com. Code § 2313) |
| | | **Count V.** | Breach of Implied Warranty (Cal. Com. Code § 2314) |
| | | **Count VI.** | Unjust Enrichment |
| | | **Count VII.** | Fraud |
| James Lewis D.M.D., James C. Lewis, D.M.D., P.A., Lazaro Fernandez, D.D.S., and Lazaro Fernandez, D.D.S., P.A., d/b/a Fernandez Dental Center-Miami Lakes Fernandez Dental Office | Florida | **Count I.** | Violation of Florida's Unfair & Deceptive Trade Practices Act (Fla. Stat. § 501.210, *et seq.*) |
| | | **Count II.** | Breach of Express Warranty (Fla. Stat. § 672.313) |
| | | **Count III.** | Breach of Implied Warranty (Fla. Stat. § 672.314) |
| | | **Count IV.** | Unjust Enrichment |
| | | **Count V.** | Fraud |
| Vikram Bhatia, D.D.S., Jeffrey Chen, D.D.S., Brookhaven Dental Associates, P.C., and Johns Creek Dental Associates, P.C. | Georgia | **Count I.** | Violation of Georgia's Fair Business Practices Act (Ga. Code § 10-1-390, *et seq.* |
| | | **Count II.** | Violation of Georgia's Uniform Deceptive Trade Practices Act (Ga. Code § 10-1-370) |
| | | **Count III.** | Breach of Express Warranty (Ga. Code § 11-2-313) |
| | | **Count IV.** | Breach of Implied Warranty (Ga. Code § 11-2-314) |
| | | **Count V.** | Unjust Enrichment |
| | | **Count VI.** | Fraud |
| Justin Ebersole, D.D.S. and Parsons Dental Care, LLC | Kansas | **Count I.** | Violation of Kansas Consumer Protection Act (Kan. Stat. § 50-623, *et seq.*) |
| | | **Count II.** | Breach of Express Warranty (Kan. Stat. § 84-2-314) |
| | | **Count III.** | Breach of Implied Warranty (Kan. Stat. § 84-2-314) |
| | | **Count IV.** | Unjust Enrichment |
| | | **Count V.** | Fraud |

43634

| Mike Henrickson, D.D.S., Dr. Myron Henrickson, and Henrickson Dental PLC | Minnesota/ Nationwide Class | Count I. | Violation the Minnesota Prevention of Consumer Fraud Act (Minn. Stat. §§ 325F.68, *et seq.*) |
|---|---|---|---|
| | | Count II. | Violation of Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. §§ 325D.43-48, *et seq.*) |
| | | Count III. | Violation of Minnesota Unlawful Trade Practices Act (Minn. Stat. § 325D.09, *et seq.*) |
| | | Count IV. | Breach of Express Warranty (Minn. Stat. § 336.2-313) |
| | | Count V. | Breach of Implied Warranty (Minn. Stat. § 336.2-314) |
| | | Count VI. | Violation of the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*) |
| | | Count VII. | Unjust Enrichment |
| | | Count VIII. | Fraud |
| Mary Gadbois, D.D.S. and Cherry Hill Dental Associates, Inc. | Missouri | Count I. | Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*) |
| | | Count II. | Breach of Express Warranty (Mo. Stat. § 400.2-313) |
| | | Count III. | Breach of Implied Warranty (Mo. Stat. § 400.2-314) |
| | | Count IV. | Unjust Enrichment |
| | | Count V. | Fraud |
| Dominick Lembo, D.M.D., Dr. Dominick Lembo, D.M.D., P.C. d/b/a Belmont Dental Associates, Jonathan Banker, D.D.S., and Banker Dental Associates, P.A. | New Jersey | Count I. | Breach of Express Warranty (N.J. Stat. § 12A:2-313) |
| | | Count II. | Breach of Implied Warranty (N.J. Stat. §§ 12A:2-314 and 2A-212) |
| | | Count III. | Violations of The New Jersey Consumer Fraud Act (N.J. Stat. §§ 56:8-1, *et seq.*) |
| | | Count IV. | Unjust Enrichment |
| | | Count V. | Fraud |

43634

6

| | | | |
|---|---|---|---|
| Dr. Timothy Rauch, D.D.S. and Desert Ridge Dental | New Mexico | **Count I.** | Violations of New Mexico's Unfair Trade Practices Act (N.M. Stat. §§ 57-12-1, *et seq.*) |
| | | **Count II.** | Breach of Express Warranty (N.M. Stat. § 55-2-313) |
| | | **Count III.** | Breach of Implied Warranty (N.M. Stat. § 55-2-314) |
| | | **Count IV.** | Fraud |
| Anthony J. Peppy D.D.S., Samuel Peppy, Jr. D.D.S., and Peppy Dental | New York | **Count I.** | Violations of New York General Business Law § 349 (N.Y. Gen. Bus. Law § 349) |
| | | **Count II.** | Violations of New York General Business Law § 349 (N.Y. Gen. Bus. Law § 350) |
| | | **Count III.** | Breach of Express Warranty (N.Y. U.C.C. Law §§ 2-313 and 2a-210) |
| | | **Count IV.** | Breach of Implied Warranty of Merchantability (N.Y. U.C.C. Law § 2-314) |
| | | **Count V.** | Unjust enrichment |
| | | **Count VI.** | Fraud |
| Paul Bookman, D.M.D., and Bryn Mawr Dental Associates, LTD | Pennsylvania | **Count I.** | Breach of Express Warranty (13 Pa. Cons. Stat. § 2313) |
| | | **Count II.** | Breach of Implied Warranty (13 Pa. Cons. Stat. § 2314) |
| | | **Count III.** | Unjust Enrichment |
| | | **Count IV.** | Fraud |
| David Dudzinski, D.D.S. and D&N Dental PLLC d/b/a/ Creekview Dental | Tennessee | **Count I.** | Breach of Express Warranty (Tenn. Code § 47-2-313) |
| | | **Count II.** | Breach of Implied Warranty (Tenn. Code § 47-2-313) |
| | | **Count III.** | Unjust Enrichment |
| | | **Count IV.** | Fraud |

43634

| | | | |
|---|---|---|---|
| Bruce Sherrill, D.D.S. | Texas | **Count I.** | Violation of the Deceptive Trade Practices Act-Consumer Protection Act (Tex. Bus. & Com. Code §§17.41, et seq.) |
| | | **Count II.** | Breach of Express Warranty (Tex. Bus. & Com. Code § 2.313) |
| | | **Count III.** | Breach of Implied Warranty (Tex. Bus. & Com. Code § 2.314) |
| | | **Count IV.** | Fraud |
| | | **Count V.** | Unjust Enrichment |
| Brent Robinson D.D.S., Robinson Dental P.S., Sean Couch D.D.S., and Sean M. Couch D.D.S. P.S. d/b/a/ Kingston Dental | Washington | **Count I.** | Violation of the Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86.010, *et seq.*) |
| | | **Count II.** | Breach of Express Warranty (Wash. Rev. Code § 62A.2-313) |
| | | **Count III.** | Breach of Implied Warranty (Wash. Rev. Code § 62A.2-314) |
| | | **Count IV.** | Unjust Enrichment |
| | | **Count V.** | Fraud |

11.     Plaintiff Angela Ferrari, D.D.S., is a resident and citizen of California. Dr. Ferrari purchased and applied Lava Ultimate crowns on her patients. After numerous Lava Ultimate crowns failed, Dr. Ferrari was forced to reapply them and pay the reapplication costs. Dr. Ferrari, in conjunction with her dental practice, has purchased and installed over 300 Lava Ultimate crowns. Before purchasing the products, she reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, she reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Dr. Ferrari relied on 3M's representations about Lava Ultimate's suitability for crowns, and she (in

43634

8

conjunction with her practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Ferrari complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Ferrari's installation techniques and saying that no other dentist was experiencing debonding problems. Dr. Ferrari suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because she bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Ferrari's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, she would not have bought Lava Ultimate. Moreover, Dr. Ferrari would not have purchased Lava Ultimate blocks if she would have known that the product was not appropriate for crowns.

12.     Plaintiff Angela M. Ferrari, D.D.S., Inc. is a corporation organized under the laws of California, with its principal place of business at 301 East Alma Street, Mount Shasta, California 96067. Between July 2012 and July 2015, Angela M. Ferrari, D.D.S., Inc. bought approximately $25,000 worth of Lava Ultimate product and applied the product as a dental crown for its patients. Before purchasing the product, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make

43634

9

it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Angela M. Ferrari, D.D.S., Inc. relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Angela Ferrari) complained to 3M over the telephone and also in person when an agent of 3M visited its office. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Ferrari's installation techniques. Angela M. Ferrari, D.D.S., Inc. suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Angela M. Ferrari, D.D.S., Inc.'s reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

13.    Plaintiff Edward Shapiro, D.D.S., is a resident and citizen of California. Dr. Shapiro purchased and applied Lava Ultimate crowns on his patients. After numerous Lava Ultimate crowns failed, Dr. Shapiro was forced to reapply them and pay the reapplication

43634

10

costs. Dr. Shapiro, in conjunction with his dental practice, purchased over 300 blocks of Lava Ultimate. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Shapiro relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Shapiro complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Shapiro's installation techniques and saying that no other dentist was experiencing debonding problems. Dr. Shapiro suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Shapiro's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Shapiro would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

43634

14.     Plaintiff Pacific Holistic Dental, Inc. is a for-profit corporation organized under the laws of Nevada, with its principal place of business at 530 W. Tefft St., Nipomo, California 93444. Between 2012 and 2015, Pacific Holistic Dental purchased over 300 blocks of Lava Ultimate and applied the products as dental crowns for its patients. Before purchasing the product, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Pacific Holistic Dental, Inc. actually relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Edward Shapiro) complained to 3M over the telephone and also in person when an agent of 3M visited its office. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Shapiro's installation techniques. Pacific Holistic Dental suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Pacific Holistic Dental's reliance on 3M's misrepresentations about

43634

Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

15.     Plaintiff Dr. Jerry Yu D.D.S. is a resident and citizen of California. Dr. Yu purchased and applied Lava Ultimate crowns on her patients. After numerous Lava Ultimate crowns failed, Dr. Yu was forced to reapply them and pay the reapplication costs.  Dr. Yu, in conjunction with his dental practice, purchased Lava Ultimate blocks and used Lava Ultimate as his exclusive crown material. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Yu relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Yu complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Yu's installation techniques and saying that no other dentist was experiencing debonding problems. Dr. Yu suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was

43634

13

appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Yu's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Yu would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

16.     Plaintiff Jerry Yu Dental Corp., d/b/a Grand Avenue Smiles, is a corporation registered under the laws of California with its principal place of business at 1461 Grand Ave, Grover Beach, California 93433. The company purchased Lava Ultimate products and used Lava Ultimate as the exclusive material for its dental crowns it applied. Before purchasing the product, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Grand Avenue Smiles actually relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Yu) complained to 3M about the failures. 3M

43634

14

continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Yu's installation techniques. Grand Avenue Smiles suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Grand Avenue Smiles' reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

17.    Plaintiff James Lewis D.M.D., is a resident and citizen of Florida. Dr. Lewis purchased and applied Lava Ultimate crowns to his patients. After numerous Lava Ultimate crowns failed, Dr. Lewis was forced to reapply them and pay the reapplication costs. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Lewis relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure

43634

15

rate of Lava Ultimate, Dr. Lewis complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Lewis' installation techniques and saying that no other dentist was experiencing debonding problems. Dr. Lewis suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Lewis' reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Lewis would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

18.     Plaintiff James C. Lewis, D.M.D., P.A., is a professional corporation organized under the laws of Florida., with its principal place of business at 4101 Little Rd, New Port Richey, Florida 34655. Dr. Lewis purchased Lava Ultimate products for use in dental crowns in its practice and used Lava Ultimate for its patients' dental crowns. Before purchasing the product, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations

43634

16

stating that the product was appropriate for crowns." The corporation relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Lewis) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming its dentists' application techniques. The company suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. The company's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

19.    Plaintiff Lazaro Fernandez, D.D.S., is a resident and citizen of Florida. Dr. Fernandez purchased and applied Lava Ultimate crowns to his patients. After numerous Lava Ultimate crowns failed, Dr. Fernandez was forced to reapply them and pay the reapplication costs. Dr. Fernandez, in conjunction with his dental practice, purchased about 800 Lava Ultimate blocks. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was

43634

appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Fernandez relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate—approximately 400 failures—Dr. Fernandez complained to 3M and 3M's sales representative, Jorge Rosario. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Fernandez's installation techniques and saying that no other dentist was experiencing debonding problems. Dr. Fernandez suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Fernandez's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Fernandez would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

20. Plaintiff Lazaro Fernandez, D.D.S., P.A., d/b/a Fernandez Dental Center-Miami Lakes Fernandez Dental Office, is a corporation registered under the laws of Florida,

43634

18

with its principal place of business at 8180 NW 155th Street, Suite 200, Miami Lakes, Florida 33016. The company purchased about 800 Lava Ultimate products for use in dental crowns in its practice and used Lava Ultimate for its patients' dental crowns. Before purchasing the products, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Fernandez Dental Center relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure—approximately 400 failures—it (through Dr. Fernandez) complained to 3M and 3M's sales representative, Jorge Rosario. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Fernandez's installation techniques. Fernandez Dental Center suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Fernandez Dental Center's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing

43634

19

conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

21.     Plaintiff Vikram Bhatia, D.D.S., is a resident and citizen of Georgia. Dr. Bhatia purchased and applied Lava Ultimate crowns on his patients. After numerous Lava Ultimate crowns failed, Dr. Bhatia was forced to reapply them and pay the reapplication costs. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Bhatia relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Bhatia complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Bhatia's installation techniques and saying that no other dentist was experiencing debonding problems. Dr. Bhatia suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to

43634

the crown's defect. Dr. Bhatia's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Bhatia would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

22.     Plaintiff Jeffrey Chen, D.D.S., is a resident and citizen of Georgia. Dr. Chen purchased and applied Lava Ultimate crowns to his patients. After numerous Lava Ultimate crowns failed, Dr. Chen was forced to reapply them and pay the reapplication costs. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Chen actually relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Chen complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Chen's installation techniques and saying that no other dentist was experiencing debonding problems. Dr. Chen suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he

43634

21

bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Chen's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Chen would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

23.    Plaintiff Brookhaven Dental Associates, P.C., is a professional corporation organized under the laws of Georgia, with its principal place of business at 1407 Dresden Dr., Suite 200, Atlanta, Georgia 30319. Brookhaven Dental Associates purchased Lava Ultimate products for use in dental crowns in its practice and used Lava Ultimate for its patients' dental crowns. Before purchasing the product, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Brookhaven Dental Associates actually relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Drs. Bhatia and Chen)

43634

complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming the dentists' installation techniques. Brookhaven Dental Associates suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Brookhaven Dental Associates' reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

24.    Plaintiff Johns Creek Dental Associates, P.C., is a professional corporation organized under the laws of Georgia, with its principal place of business at 10305 Medlock Bridge Road B3, Johns Creek, Georgia 30097. Johns Creek Dental Associates purchased Lava Ultimate products for use in dental crowns in its practice and used Lava Ultimate for its patients' dental crowns. Before purchasing the product, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns," that Lava

43634

23

Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Brookhaven Dental Associates relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Drs. Bhatia and Chen) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming the dentists' installation techniques. Brookhaven Dental Associates suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Brookhaven Dental Associates' reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

25.     Plaintiff Justin Ebersole, D.D.S., is a resident and citizen of Kansas. Dr. Ebersole purchased and applied Lava Ultimate crowns to his patients. After numerous Lava Ultimate crowns failed, Dr. Ebersole was forced to reapply them and pay the reapplication costs. Dr. Ebersole, in conjunction with his dental practice, purchased hundreds of Lava Ultimate blocks. Before purchasing the products, he reviewed various marketing materials

43634

24

in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Ebersole relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Ebersole complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Ebersole's application techniques and saying that no other dentist was experiencing debonding problems. Dr. Ebersole suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Ebersole's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Ebersole would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

26.     Plaintiff Parsons Dental Care, LLC is a limited liability company organized under the laws of Kansas, with its principal place of business at 1701 Washington Ave.,

43634

Parsons, Kansas 67357. The company's members or partners comprise people or entities with Kansas citizenship, none of whom are citizens of Minnesota for jurisdiction purposes. Parsons Dental Care, LLC purchased hundreds of Lava Ultimate products for use in dental crowns in its practice and used Lava Ultimate for its patients' dental crowns. Before purchasing the product, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Parsons Dental Care relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Justin Ebersole) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Ebersole's application techniques. Parsons Dental Care suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Parsons Dental Care's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing

43634

conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

27.     Plaintiff Mike Henrickson, D.D.S., is a resident and citizen of Minnesota. Dr. Henrickson purchased and applied Lava Ultimate crowns on his patients. After numerous Lava Ultimate crowns failed, Dr. Henrickson was forced to reapply them and pay the reapplication costs.  Dr. Henrickson, in conjunction with he and his father's dental practice, purchased over 900 Lava Ultimate blocks—over 400 of which have failed. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Mike Henrickson relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Mike Henrickson complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Mike Henrickson's application techniques and saying that no other dentist was experiencing debonding problems. Dr. Mike Henrickson suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate

43634

for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Mike Henrickson's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Mike Henrickson would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

28.     Plaintiff Myron Henrickson, D.D.S. is a residence and citizen of Minnesota. He purchased and applied Lava Ultimate crowns on his patients. After the Lava Ultimate crowns failed, Dr. Myron Henrickson was forced to reapply them and pay the reapplication costs. Dr. Myron Henrickson, in conjunction with he and his son's dental practice, purchased over 900 Lava Ultimate blocks—over 400 of which have failed. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Myron Henrickson relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure

43634

28

rate of Lava Ultimate, Dr. Myron Henrickson complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Myron Henrickson's application techniques and saying that no other dentist was experiencing debonding problems. Dr. Myron Henrickson suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Myron Henrickson's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, , Dr. Myron Henrickson would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

29.     Plaintiff Henrickson Dental PLC is a professional limited liability company organized under the laws of Minnesota, with its principal place of business at 1560 Beam Ave, Maplewood, Minnesota 55109. The company's member or partners comprise individuals who are people or entities with Minnesota citizenship. The company purchased over 900 Lava Ultimate blocks for use in dental crowns in its practice and applied the product as a dental crown for its patients. Before purchasing the product, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations

43634

29

in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Henrickson Dental relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate—over 400 of which have failed—it (through Drs. Mike and Myron Henrickson) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming the dentists' application techniques. Henrickson Dental suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Henrickson Dental's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

30.     Plaintiff Mary Gadbois, D.D.S., is a resident and citizen of Missouri. Dr. Gadbois purchased and applied Lava Ultimate crowns on her patients. After numerous Lava Ultimate crowns failed, Dr. Gadbois was forced to reapply them and pay the reapplication

43634

30

costs.  Dr. Gadbois, in conjunction with her dental practice, purchased hundreds of Lava Ultimate blocks and used Lava Ultimate as her exclusive crown material. Before purchasing the products, she reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, she reviewed 3M's representations in marketing materials and PowerPoint presentations stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Gadbois relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with her practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Gadbois complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Gadbois' application techniques and saying that no other dentist was experiencing debonding problems. Dr. Gadbois suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Gadbois' reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, she would not have bought Lava

Ultimate. Moreover, Dr. Gadbois would not have purchased Lava Ultimate blocks if she would have known that the product was not appropriate for crowns.

31.     Plaintiff Cherry Hill Dental Associates, Inc. is a corporation registered under the laws of Missouri with its principal place of business at 2012 Cherry Hill Drive, Columbia, Missouri 65203. The company purchased Lava Ultimate products and applied the product as a dental crown for its patients. Before purchasing the products, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials and PowerPoint presentations stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Cherry Hill Dental relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Gadbois) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Gadbois' application techniques. Cherry Hill Dental suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to

43634

the crown's defect. Cherry Hill Dental's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

32.    Plaintiff Dominick Lembo, D.M.D., is a resident and citizen of New Jersey. Dr. Lembo purchased and applied Lava Ultimate crowns to his patients. After numerous Lava Ultimate crowns failed, Dr. Lembo was forced to reapply them and pay the reapplication costs. Dr. Lembo, in conjunction with his dental practice, purchased hundreds of Lava Ultimate blocks. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Dr. Lembo relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, which reached 75%, Dr. Lembo complained to 3M and 3M's sales representatives Glen Steinhauer and Aaron Brockner. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Lembo's application techniques and saying that no other dentist was experiencing

43634

33

debonding problems. Dr. Lembo suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Lembo's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Lembo would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

33.     Dr. Dominick Lembo, DMD, P.C. d/b/a Belmont Dental Associates is a professional corporation registered under the laws of New Jersey, with its principal place of business at 476 Belmont Ave., Haledon, New Jersey 07508. The company purchased hundreds of Lava Ultimate products for use in dental crowns in its practice and applied the product as a dental crown for its patients. Before purchasing the products, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Belmont Dental Associates relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use

in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Lembo) complained to 3M's sales representatives Glen Steinhauer and Aaron Brockner. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Lembo's application techniques. Belmont Dental Associates suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Belmont Dental Associates' reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

34.     Plaintiff Jonathan Banker, D.D.S., is a resident and citizen of New Jersey. Dr. Banker purchased and applied Lava Ultimate crowns to his patients. After numerous Lava Ultimate crowns failed, Dr. Banker was forced to reapply them and pay the reapplication costs. Dr. Banker, in conjunction with his dental practice, purchased 500–700 Lava Ultimate blocks, making him one of the largest purchasers in New Jersey. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he

43634

35

reviewed 3M's representations in marketing materials stating, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Dr. Banker relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Banker complained to 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Banker's application techniques and saying that no other dentist was experiencing debonding problems. Dr. Banker suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Banker's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Banker would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

35.    Plaintiff Banker Dental Associates, P.A. is a corporation registered under the laws of New Jersey, with its principal place of business at 105 Elmora Ave, Elizabeth, New Jersey 07202. The company purchased 500 to 700 Lava Ultimate blocks for use in dental

43634

crowns in its practice, making it one of the largest buyers in the New Jersey. The dental practice applied its Lava Ultimate product dental crowns for its patients. Before purchasing the products, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Banker Dental Associates relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Banker) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Banker's application techniques. Banker Dental Associates suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Banker Dental Associates' reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate.

43634

Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

36.     Plaintiff Dr. Timothy Rauch, D.D.S., is currently a resident and citizen of California. During the Class Period, he purchased and applied Lava Ultimate crowns to his patients while practicing in New Mexico during the class period. After the Lava Ultimate crowns failed, Dr. Rauch was forced to reapply them and pay the reapplication costs.  Dr. Rauch, in conjunction with his dental practice, purchased Lava Ultimate blocks and used Lava Ultimate as his exclusive crown material. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Dr. Rauch relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Rauch complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Rauch's application techniques and saying that no other dentist was experiencing debonding problems. Dr. Rauch suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the

43634

product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Rauch's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Rauch would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

37.    Plaintiff Desert Ridge Dental is a corporation registered under the laws of New Mexico with its principal place of business at 6521 Paradise Boulevard, NW, Albuquerque, NM 87114. The company was previously known as Neighborhood Smiles. The company purchased Lava Ultimate products and applied the product as a dental crown for its patients. Before purchasing the products, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Desert Ridge Dental relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Tim Rausch) complained to 3M. 3M

43634

continually represented that Lava Ultimate was not the problem and was not defective, instead blaming the Dr. Rausch's application techniques. Desert Ridge Dental suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Desert Ridge Dental's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

38.     Plaintiff Anthony J. Peppy D.D.S., is a resident and citizen of New York. Dr. Anthony Peppy purchased and applied Lava Ultimate crowns to his patients. After numerous Lava Ultimate crowns failed, Dr. Anthony Peppy was forced to reapply them and pay the reapplication costs.  Dr. Anthony Peppy, in conjunction with Samuel J. Peppy Jr.'s dental practice, purchased Lava Ultimate blocks—the majority of which have failed. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." 3M's sales representative, Jeff Jensen,

43634

represented that Lava Ultimate was appropriate for crowns. Dr. Anthony Peppy relied on

3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction

with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high

failure rate of Lava Ultimate, Dr. Anthony Peppy complained to 3M and 3M's sales

representative. 3M continually represented that Lava Ultimate was not the problem and was

not defective, instead blaming Dr. Anthony Peppy's application techniques. Dr. Anthony

Peppy suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate

was appropriate for use in dental crowns because he bore the costs of the product's defect,

which include the various costs associated with reapplying the crown and/or remedying

damage the patient suffered due to the crown's defect. Dr. Anthony Peppy's reliance on

3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an

immediate cause of the injury-causing conduct because, but for 3M's misrepresentations,

he would not have bought Lava Ultimate. Moreover, Dr. Anthony Peppy would not have

purchased Lava Ultimate blocks if he would have known that the product was not

appropriate for crowns.

39.    Plaintiff Samuel Peppy, Jr. D.D.S., is a resident and citizen of New York. Dr.

Samuel Peppy, Jr. purchased and applied Lava Ultimate crowns on his patients. After

numerous Lava Ultimate crowns failed, Dr. Samuel Peppy, Jr. was forced to reapply them

and pay the reapplication costs.  Dr. Samuel Peppy, Jr., in conjunction with Dr. Anthony

Peppy's dental practice, purchased Lava Ultimate blocks—the majority of which have

failed. Before purchasing the products, he reviewed various marketing materials in which

43634

41

3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." 3M's sales representative, Jeff Jensen, represented that Lava Ultimate was appropriate for crowns. Dr. Samuel Peppy, Jr. relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Samuel Peppy, Jr. complained to 3M and 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Samuel Peppy Jr.'s application techniques. Dr. Samuel Peppy, Jr. suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Samuel Peppy Jr.'s reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Samuel Peppy, Jr. would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

43634

40.     Plaintiff Peppy Dental is a corporation organized under the laws of New York, with its principal place of business at 1237 North Main St. Jamestown, New York 14701. It purchased Lava Ultimate blocks for use in dental crowns in its practice and applied the product as a dental crown for its patients. The majority of those crowns debonded. Before purchasing the product, it reviewed various marketing materials in which 3M and its representative, Jeff Jensen, touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, Peppy Dental reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns." Peppy Dental relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Drs. Anthony Peppy and Samuel Peppy, Jr.) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming the dentists' techniques. Peppy Dental suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Peppy Dental's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns

43634

43

was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

41.    Plaintiff Paul Bookman, D.M.D., is a resident and citizen of Pennsylvania. Dr. Bookman purchased and applied Lava Ultimate crowns on his patients. After numerous Lava Ultimate crowns failed, Dr. Bookman was forced to reapply them and pay the reapplication costs. Dr. Bookman, in conjunction with his dental practice, purchased over 100 Lava Ultimate blocks. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Dr. Bookman relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Bookman complained to 3M's sales representative, Heinz Daniels. Dr. Bookman also had an extended conversation with 3M's Peter Golden at an industry conference in which Mr. Golden stated that Lava Ultimate was not defective, and instead blamed Dr. Bookman's bonding protocol for the debonds. Dr. Bookman suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate

43634

for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Bookman's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Bookman would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

42.    Plaintiff Bryn Mawr Dental Associates, LTD, is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 945 Haverford Road, Bryn Mawr, Pennsylvania 19010. The company purchased over 100 Lava Ultimate blocks for use in dental crowns in its practice and applied the product as a dental crown for its patients . Before purchasing the products, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Bryn Mawr Dental Associates relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through

43634

Dr. Bookman) complained to 3M's sales representative, Heinz Daniels. It also notified 3M's Peter Golden of the failure rates associated with Lava Ultimate at an industry conference, where Mr. Golden stated that Lava Ultimate was not defective, instead blaming Dr. Bookman's application techniques. Bryn Mawr Dental Associates suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Bryn Mawr Dental Associates' reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

43.    Plaintiff David Dudzinski, D.D.S., is a resident and citizen of Tennessee. Dr. Dudzinksi purchased and applied Lava Ultimate crowns on his patients. After numerous Lava Ultimate crowns failed, Dr. Dudzinksi was forced to reapply them and pay the reapplication costs. Dr. Dudzinksi, in conjunction with his dental practice, purchased Lava Ultimate blocks – many of which have failed. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was

43634

46

indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Dr. Dudzinksi relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Dudzinksi complained verbally and via email to 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Dudzinksi's application techniques and saying that no other dentist was experiencing debonding problems. Dr. Dudzinksi suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Dudzinksi's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Dudzinksi would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

44.    Plaintiff D&N Dental PLLC d/b/a/ Creekview Dental a professional limited liability company organized under the laws of Tennessee with its principal place of business at 1450 Sam Davis Rd. Suite 120, Smyrna, Tennessee 37167. None of the company's members or partners comprise individuals who are people or entities with Minnesota citizenship. The company purchased Lava Ultimate products and applied the product as a

43634

dental crown for its patients . The company purchased or installed Lava Ultimate blocks as crowns. Before purchasing the products, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Creekview Dental relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Dudzinksi) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Dudzinksi's application techniques. Creekview Dental suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Creekview Dental's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

43634

45.     Plaintiff Bruce Sherrill, D.D.S., is a resident and citizen of Texas who operates his dental practice in Dallas, Texas as a sole proprietorship. Dr. Sherrill purchased and applied Lava Ultimate crowns on his patients. After the Lava Ultimate crowns failed, Dr. Sherrill was forced to reapply them and pay the reapplication costs. Dr. Sherrill on behalf of his practice purchased over 300 Lava Ultimate blocks. Before purchasing the products, he reviewed 3M's marketing materials, which included flyers, instruction sheets, and data sheets stating that Lava Ultimate was a superior crown material. In those marketing materials, 3M represented that Lava Ultimate had "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Dr. Sherrill relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Sherrill complained to 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Sherrill's application techniques and saying that no other dentist was experiencing debonding problems. Dr. Sherrill suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Sherrill's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing

43634

conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Sherrill would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

46.     Plaintiff Brent Robinson D.D.S., is a resident and citizen of Washington. Dr. Robinson purchased and applied Lava Ultimate crowns on his patients. After numerous Lava Ultimate crowns failed, Dr. Robinson was forced to reapply them and pay the reapplication costs. Dr. Robinson, in conjunction with his dental practice, purchased approximately 350 to 400 Lava Ultimate blocks – many of which have failed. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Dr. Robinson relied on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Robinson complained to 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Robinson's application techniques and saying that no other dentist was experiencing debonding problems. Dr. Robinson suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of

43634

50

the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Robinson's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Robinson would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

47.    Plaintiff Robinson Dental P.S. is a corporation registered under the laws of Washington with its principal place of business at 19108 33rd Ave. W Ste. B Lynwood, Washington, 98036. The company purchased Lava Ultimate products and applied the product as a dental crown for its patients. The company purchased or installed approximately 350 to 400 Lava Ultimate blocks. Before purchasing the products, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Robinson Dental relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it

43634

51

(through Dr. Robinson) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Robinson's application techniques. Robinson Dental suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Robinson Dental's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

48.    Plaintiff Sean Couch D.D.S., is a resident and citizen of Washington. Dr. Couch purchased and applied Lava Ultimate crowns on his patients. After numerous Lava Ultimate crowns failed, Dr. Couch was forced to reapply them and pay the reapplication costs. Dr. Couch, in conjunction with his dental practice, purchased over 150 Lava Ultimate blocks – many of which have failed. Before purchasing the products, he reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, he reviewed 3M's representations in marketing materials stating, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Dr. Couch relied

43634

52

on 3M's representations about Lava Ultimate's suitability for crowns, and he (in conjunction with his practice) purchased Lava Ultimate blocks for use in crowns. After seeing the high failure rate of Lava Ultimate, Dr. Couch complained to 3M's sales representative. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Couch's application techniques and saying that no other dentist was experiencing debonding problems. Dr. Couch suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because he bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Dr. Couch's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, he would not have bought Lava Ultimate. Moreover, Dr. Couch would not have purchased Lava Ultimate blocks if he would have known that the product was not appropriate for crowns.

49.     Plaintiff Sean M. Couch D.D.S. P.S. d/b/a/ Kingston Dental is a corporation registered under the laws of Washington with its principal place of business at 25985 Barber Cut Off Road NE, Kingston, Washington 98346. The company purchased Lava Ultimate products and applied the product as a dental crown for its patients. The company purchased or installed over 150 Lava Ultimate blocks. Before purchasing the products, it reviewed various marketing materials in which 3M touted Lava Ultimate's use in crowns and stated that the product was appropriate for use in crowns. For example, it reviewed 3M's

43634

53

representations in marketing materials stating, among other things, that Lava Ultimate's "innovative characteristics make it especially impressive for . . . crowns," that Lava Ultimate was indicated for crowns, and/or similar representations stating that the product was appropriate for crowns. Kingston Dental relied on 3M's representations about Lava Ultimate's suitability for crowns, and it purchased Lava Ultimate blocks for use in crowns. It has replaced several defective Lava Ultimate crowns at its own expense, and 3M has not reimbursed it for its losses. After seeing the high failure rate of Lava Ultimate, it (through Dr. Couch) complained to 3M. 3M continually represented that Lava Ultimate was not the problem and was not defective, instead blaming Dr. Couch's application techniques. Kingston Dental suffered injury from 3M's misrepresentations in which 3M stated that Lava Ultimate was appropriate for use in dental crowns because it bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect. Kingston Dental's reliance on 3M's misrepresentations about Lava Ultimate's suitability for dental crowns was an immediate cause of the injury-causing conduct because, but for 3M's misrepresentations, it would not have bought Lava Ultimate. Moreover, it would not have purchased Lava Ultimate blocks if it would have known that the product was not appropriate for crowns.

50.     Defendant 3M is a corporation doing business in every U.S. state, the District of Columbia, and U.S. territories. 3M is organized under the laws of Delaware, with its principal place of business at 3M Center, Maplewood, Minnesota, where 3M makes

43634

decisions about the research, development, marketing, and sale of its products, including Lava Ultimate. 3M manufactures and markets dental and orthodontic products through its business unit, 3M ESPE. 3M ESPE manufactures and sells more than 2,000 dental and orthodontic products include restoratives, adhesives, finishing and polishing products, crowns, impression materials, preventive sealants, professional tooth whiteners, infection control products, prophylaxis and orthodontic appliances. Based on information and belief, 3M ESPE is merely a business unit of 3M and is not a separate entity or party in this matter.

## FACTUAL ALLEGATIONS

### A.    Dental Restorations

51.    A dental restoration uses various types of material to restore the function, integrity, and morphology of missing tooth structure. Restorations can range from small fillings to larger procedures like crowns and bridges.

52.    Generally, a restoration (and the material from which it is created) should be durable, aesthetically pleasing, and efficient to manufacture. And ideally, the application process should cause the least pain and inconvenience to the patient as possible. Since the advent of restorative dentistry in the mid-1900s, dentists have sought a single restoration material that could be used for a broad range of dental procedures. Finding such a material has proven elusive.

53.    Fillings and small cavities, for example, are "direct restorations" as a dentist can fabricate the restoration directly inside the patients' mouth. Direct restorations are relatively convenient for patients because a dentist performs the restoration "chairside." In

43634

other words, the dentist places, cures, and shapes the restoration material in the patient's mouth during a single sitting.

54.     When damage to a tooth is more extensive, placing, curing, and shaping the restoration directly inside a patient's mouth is often impossible or impractical. In these cases, "indirect restorations" are done where the dentist fabricates the restoration outside the patient's mouth. Depending on the extent and location of damage, a dentist may bond a unique inlay, onlay, veneer, or crown to the patient's existing tooth structure. A veneer can be placed on the surface of a tooth to protect it from damage, but it is generally used only for aesthetic purposes. Dental inlays and onlays are indirect restorations for moderate tooth damage. Inlays fill the space in the center of the tooth between the rounded edges of the tooth and onlays cover the edges of the tooth.



55.     In some cases, a tooth is too damaged for an inlay or an onlay. If, for example, a patient has a large cavity, fractured her tooth, or needs a root canal, the patient may require a full dental crown, which is sometimes referred to as a "prosthetic crown." A dental crown is a tooth-shaped cap that completely covers a tooth or dental implant.

43634

56



56.     In the past, patients receiving dental crowns typically had to make at least two visits to the dentist. Multiple trips were necessary because dentists could not shape, place, and cure the crown chairside during a single sitting. A patient would first go to the dentist for an initial visit where the dentist would create a molding or impression of the damaged tooth. The dentist would then fit the patient with a temporary prosthetic crown that would last until the patient returned for a subsequent visit.

57.     Meanwhile, the dentist would send that molding or impression to an off-site laboratory that would cast and shape the prosthetic crown. The laboratory technician had to take great care in shaping the prosthetic to ensure that the crown would bond correctly to the tooth structure and fit properly with the patient's gums and other teeth. Laboratory technicians usually cast the prosthetic in metal, so if the patient wanted an aesthetically

pleasing tooth, the laboratory technician would have to go through the time-consuming process of incrementally placing and baking ceramic material onto the prosthetic.

58.    During the patient's subsequent visit, the dentist would fit and cement or otherwise bond the prosthetic crown to the patient's existing tooth.

59.    This two-step process had multiple disadvantages. First, it was difficult to take an accurate impression of the patient's tooth, and the fabricating process was extremely labor intensive. As a result, there was a high potential for human error. Further, patients had to undergo multiple dental procedures over the course of separate office visits—doubling the time the patient had to endure the discomfort from the dental work and sedation as well as increasing the inconvenience and expense of multiple trips to the dentist.

**B.    Dentists begin to use computer-assisted restorations to reduce the time to create crowns and other indirect restorations.**

60.    To overcome the limitations of indirect restorations, scientists in the early 1980s implemented new computer-aided design and computer aided manufacturing ("CAD/CAM") restorations. CAD/CAM restorations involve taking digital impressions of the tooth and mouth using small cameras that make different types of scans. Proprietary software analyzes these scans and then creates a design that is sent to a machine that mills or prints a three-dimensional prosthetic tooth.

61.    Although CAD/CAM restorations reduced human error in the fabrication process, they did not initially improve on the two-visit indirect restoration process that dentists had traditionally used. Early CAD/CAM shaping and curing still had to be done off-site because the machines that milled the crown were too big to fit in a typical dental

43634

58

office. Consequently, dental crowns in most cases still could not be created "chairside," and patients still had to make separate visits to the dentist for the fitting and bonding portions of the procedure.

62.     A breakthrough occurred in the mid-1980s, however, when Professor Werner H. Mörmann and Dr. Marco Brandestini developed the Chairside Economical Restoration of Esthetic Ceramics ("CEREC"). As the name suggests, CEREC allowed dentists to construct, produce, and insert indirect restorations (like crowns) chairside in a single appointment. By October 2013, around 38,000 dentists worldwide used CEREC to produce around 6.9 million restorations each year.

63.     Despite the technological advances that were accomplished through CEREC machines, dentists still had some concerns because the materials that were compatible with the CEREC machine could not be used across a wide spectrum of restorations. Early CEREC inlays, onlays, veneers, and crowns were made out of ceramics.

64.     Dental ceramics are inorganic structures consisting of metallic and semi-metallic elements and oxygen compounds. Ceramics most closely resemble natural teeth and are prized for their aesthetic characteristics. They are also relatively convenient because dentists can mill them chairside using a CEREC machine in a relatively short time. But ceramic materials are brittle and prone to fracture because of their high compressive and low tensile strengths. Their low fracture toughness was a major disadvantage that limited their application to the posterior regions of the mouth and prevented them from being used

43634

in crowns, veneers, implant-supported restorations, implant abutments, and fixed partial dentures.

65.     Zirconia is a crystalline dioxide of zirconium and is one of the strongest ceramics for the dental market today. Zirconia restorations are extremely durable and fracture-resistant, which enables multi-tooth restorations; however, the material requires a long strengthening procedure, which makes chairside production impractical in most cases.

66.     Because no single restoration material addressed the wide variety of issues that dentists face, dentists had to purchase numerous types of restoration material, many of which required different techniques for creation and application.

**C.     3M introduced Lava Ultimate to the market.**

67.     In order to address some of these concerns, 3M introduced Lava Ultimate as a chairside solution to the problems dentists faced in performing indirect restorations with ceramic and other materials.



68.     Lava Ultimate is a resin nano-ceramic consisting of roughly 80% ceramic and 20% composite resin with nano-technology. The resin nano-ceramic was intended to have

43634

greater wear resistance, yet have the same aesthetic properties (e.g., polish retention) of glass ceramics. Lava Ultimate was also purported to have an elastic modulus like dentin and be able to reduce the restorative stress of biting.

69.     3M sought and obtained clearance from the Food and Drug Administration ("FDA") to market Lava Ultimate under Section 510(k) of the Medical Device Amendment to the Food, Drug, and Cosmetics Act.

70.     Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with respect to the products.

71.     3M's application to the FDA for 510(k) approval described Lava Ultimate as "a strong, wear-resistant and highly esthetic mill block that provides a fast and easy to use alternative to porcelain blocks" and indicates that is should be used for "inlays, onlays, veneers, and *full crown restorations, including crowns on implants*."[2]

72.     In a January 2011 letter, the FDA determined that Lava Ultimate was "substantially equivalent" and allowed it to be legally marketed "subject to the general controls provisions of the Act." The 2011 letter from the FDA further classified Lava Ultimate as a Class II medical device and advised that 3M "must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807);

---

[2] *3M ESPE Lava Ultimate CAD/CAM Restorative 510(k) Summary*, submitted Aug. 21, 2012, available at https://www.accessdata.fda.gov/cdrh_docs/pdf12/K122569.pdf (last visited Dec. 12, 2016) (emphasis added).

43634

labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events (21 CFR Part 820)."

**D.    3M widely promoted Lava Ultimate.**

73.    Following FDA approval, 3M launched Lava Ultimate in or around 2011. 3M pitched Lava Ultimate to dentists as durable enough for use in any type of restoration, convenient enough to be milled chairside, and aesthetically pleasing to patients and dentists alike. As a result, 3M widely marketed Lava Ultimate as suitable for many types of indirect dental restorations, including crowns.

74.    3M made its representations on the product box, in the instructions for use, on its website, in numerous marketing brochures and mailers, in press releases, in industry magazines, at industry conferences and trade shows, and in sponsored "news" stories and elsewhere.

75.    3M widely advertised that Lava Ultimate was especially suitable for crowns in its marketing and promotional materials. It also touted that the material was fracture resistant, could better absorb chewing forces, and was superior to alternative products.

76.    For example, 3M described Lava Ultimate as,

A resin nano ceramic [that] has an elastic modulus that's comparable to dentin— which is much lower than what brittle glass ceramic materials or PFM veneering porcelains provide. This enables Lava Ultimate restorative to better absorb chewing forces and reduce stress to the CAD/CAM restoration. This is especially advantageous for crowns over implants. A tooth is naturally protected by the flex of

43634

the periodontal ligament, but the implant procedure removes the ligament, leaving no shock absorbance or sensory function—so the crown may fracture or chip.[3]

77.    3M represented that Lava Ultimate's elasticity allowed it to better "give way" as compared to glass ceramic materials, which supposedly increased durability.[4] In addition, 3M proclaimed that Lava Ultimate "can absorb significantly more stress without suffering permanent deformation or failure."[5] 3M also marketed Lava Ultimate as being gentle to other teeth in the mouth.

78.    3M further promoted Lava Ultimate's use in crowns, writing in bold language that the product's "innovative characteristics make it especially impressive for implant-supported crowns."[6]  In more bolded language, 3M stated: "It's tough, resilient and durable – with a 10-year warranty. The impressive durability of resin nano-ceramic also comes from its high flexural strength of 200 MPa, making Lava Ultimate restorative a tough CAD/CAM material with excellent resiliency."[7]

---

[3]  *Lava Ultimate Restorative Brochure for Dentists* at 3, available at http://solutions.3m.com.sg/3MContentRetrievalAPI/BlobServlet?lmd=1372513310000&locale=en_SG&assetType=MMM_Image&assetId=1361628433891&blobAttribute=ImageFile (last visited Nov. 15, 2016)).

[4]  *Lava Ultimate Technical Product Profile*, at 14, available at http://rdentlab.com/wp-content/uploads/2014/02/Lava-Ultimate-Technical-Product-Profile.pdf  (last  visited January 3, 2017).

[5]  *Id.* at 12.

[6]  *Lava Ultimate*: *A shock-absorbing material with unique functionality*, at 2, available at http://solutions.3m.com.sg/3MContentRetrievalAPI/BlobServlet?lmd=1372513310000&locale=en_SG&assetType=MMM_Image&assetId=1361628433891&blobAttribute=ImageFile (last visited January 3, 2017).

[7]  *Id.* at 3.

43634

79.    In addition to the characteristics noted above, 3M also marketed Lava Ultimate as being more economical than the industry leading "E-Max" crown from Ivoclar Vivadent.

80.    In a July 2, 2012 press release entitled "3M™ ESPE™ Brings Lava™ Ultimate Restorative to Labs," 3M stated:

> Lava Ultimate restorative is part of a new class of CAD/CAM material based on 3M ESPE's renowned nanotechnology. This resilient new milling material is incredibly durable and shock absorbent, not brittle. The unique properties of the CAD/CAM material enable a fast, no-firing process, and only a few minutes of polishing are needed to achieve an enamel-like luster. The resin nano ceramic CAD/CAM material also allows dentists to easily make adjustments, as well as to build-up and reseal restorations.

> Lava Ultimate restorative CAD/CAM material builds upon two of 3M's core technology platforms: ceramics and nanotechnology. 3M has developed a proprietary process for creating the CAD/CAM material, which is formulated from a blend of approximately 80 percent nanoceramic particles embedded in a highly-cured resin matrix. The result is a unique, patented resin nano ceramic milling material that maintains a brilliant, long-lasting polish.

> Lava Ultimate restorative is indicated for a full range of permanent adhesive, single-unit restorations, including crowns, onlays, inlays and veneers. Additionally, Lava Ultimate restorative is ideally suited for implant-supported restorations because of its high flexural strength, shock-absorbing properties and low wear. Lava Ultimate restorative reduces stress to the implant, and dentists can adjust the material for occlusion with additive and subtractive techniques.[8]

81.    In another brochure previously mentioned, 3M stated:

> Lava™ Ultimate CAD/CAM blocks perform similarly to or better than glass ceramic and composite materials. Lava™ Ultimate Restorative's high fracture

---

[8] *3M™ ESPE™ Brings Lava™ Ultimate Restorative to Labs*, available at https://solutions.3m.com/wps/portal/3M/en_LK/3M-ESPE-APAC/dental-professionals/whats-new/press-releases/?PC_Z7_RJH9U523081260IMTQ7SHA1EO1000000_assetId=1319232428450 (last visited Jan. 3, 2017).

43634

toughness, flexural strength and resiliency, assure that milled restorations will exhibit excellent durability.

. . . .

Benefits of Lava™ Ultimate Restorative to the dentist and patient include:

- a faster procedure compared to other CAD/CAM materials: firing is not required and milling, polishing and adjustment are easier

- durability and shock absorption characteristics from a unique combination of mechanical properties

- intra-oral adjustability with light cured restoratives[9]

82.    In a "Quick Reference Guide" for "Lava Ultimate Restorative for Full Coverage Crowns," 3M similarly touted:

Clinicians around the globe have realized the multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials, including:

- Fast and easy work-flow: Easy milling, no firing, easy polishing

- Excellent millability provides better marginal quality

- Repairability [sic]

- Lower wear of opposing dentition[10]

---

[9]    *Lava Ultimate Technical Product Profile*, previously available at http://multimedia.3m.com/mws/media/972470O/lava-ultimate-study-booklet.pdf.    Like other materials cited in the related cases that have since been consolidated, 3M's website hosted such materials, but has since removed them. 3M made similar representations in its Technical Product Profile, which is still available at http://rdentlab.com/wp-content/uploads/2014/02/Lava-Ultimate-Technical-Product-Profile.pdf (last visited Nov. 15, 2016).

[10]    *Lava Ultimate Restorative Quick Reference Guide*, previously available at http://multimedia.3m.com/mws/media/1000609O/lava-ultimate-crown-guidance.pdf.http://multimedia.3m.com/mws/media/1000609O/lava-ultimate-crown-

43634

83.     In a 2013 version of 3M's "Clinical Preparation and Handling Guidelines for

Dentists and Dental Labs - Lava Ultimate Restorative," 3M represented:

> Lava Ultimate Restorative is a "new to the world" CAD/CAM material utilizing
> 3M's revolutionary nanoceramic technology. This new material, called a Resin
> Nano Ceramic is unique in durability and function. Its innovative characteristics
> make it especially impressive for implant-supported crowns. And if it's reliable in
> that tough role, just imagine how it will perform in other challenging single-unit
> indications.[11]

84.     3M later removed this language from the Guidelines after seeing Lava

Ultimate's shockingly high debond rate.

85.     A "Product Profile" 3M promotional piece that appeared in the August 2012

issue of Dentaltown, magazine stated:

> Lava Ultimate restorative is resilient, not brittle, and is incredibly durable and shock
> absorbent. Because the material is less brittle, it provides better edge quality.
> Scanning electron microscope images have shown that inlays milled with this
> material exhibit less chipping at the margins than those made with glass ceramics,
> including lithium disilicate. The shock absorbency of the material also results in less
> wear to opposing enamel than glass ceramics.
>
> Lava Ultimate restorative is indicated for a full range of permanent adhesive, single-
> unit restorations including crowns, onlays, inlays and veneers. Additionally, the
> material is ideally suited for implant supported restorations because of its high
> flexural strength and low wear. Lava Ultimate restorative reduces stress to the

---

guidance.pdf.     The     same     materials     are     currently     available     at
http://www.drbrianhoffman.com/images/registered/Lava_Ultimate_Restorative_Quick_re
feence_guide.pdf     http://     www.drbrianhoffman.com/     images/registered/
Lava_Ultimate_Restorative_Quick_refeence_guide.pdf (last visited Nov. 15, 2016).

[11] *Clinical Preparation and Handling Guidelines for Dentists and Dental Labs - Lava
Ultimate Restorative*, available at http://www.rvdalab.com/pdf/lava-prep-2013.pdf (last
visited Nov. 15, 2016).

43634

implant, and dentists can easily adjust the material for occlusion with additive and subtractive techniques.[12]

86.     Based on 3M's representations and aggressive marketing, Plaintiffs and the class members purchased 3M's Lava Ultimate product for widespread use as dental crowns throughout their practices.

**E.     3M's Lava Ultimate contains a defect resulting in a shockingly high failure rate when the material is used in crowns.**

87.     Prosthetic crowns made using Lava Ultimate debond at an alarming rate that far exceeds any acceptable failure rate and all will eventually debond. The debonding failures are due to inherent defects in Lava Ultimate.

88.     Lava Ultimate is inherently defective because it loses its adhesive properties after being exposed to conditions (normal temperature fluctuations) that are present in every patient's mouth. When exposed to such temperatures fluctuations, the perimeter of the Lava Ultimate crown contracts and moves inward, resulting in a dimensional change in the crown. As a result of the crown's dimensional changes, the crown is subjected to additional tensile stress, which causes the bond between the crown and tooth to weaken. Because of such weakening, the crown eventually separates from the tooth. All of 3M's Lava Ultimate products have this inherent defect.

---

[12] *3M ESPE Lava Ultimate Restorative: A New Class of CAD/CAM Material*, available at http://www.dentaltown.com/Images/dentaltown/magimages/0812/DTAug12pg71.pdf (last visited Nov. 15, 2016).

43634

**F.**     **Using material misrepresentations and omitting material information, 3M induced dentists to purchase its defective Lava Ultimate product for use in crowns.**

89.     3M engaged in a two-prong approach to induce dentists to purchase Lava Ultimate for use in crowns. First, it undertook an aggressive marketing campaign touting Lava Ultimate as a superior product that was acceptable for use in dental crowns. Second, it failed to warn (and later denied) that Lava Ultimate had a material defect that caused the unacceptably high debond rates, even when faced with complaints from dentists across the country. Rather than accept responsibility and acknowledge the defect, it blamed dentists for the debonds.

90.     3M's marketing and statements prior to June 12, 2015 (many of which are described in detail above) were knowingly and intentionally false. Through that advertising campaign, 3M intentionally and successfully deceived Plaintiffs and the class members into believing that Lava Ultimate was an effective material for crowns when in fact 3M knew it was a defective product that resulted in harm to dentists and patients.

91.     For example, in Lava Ultimate's Technical Product Profile, 3M indicated that Lava Ultimate could be used for "[p]ermanent, adhesive, single-tooth restorations including crowns [and] crowns over implants."[13]

---

[13] *Lava Ultimate CAD/CAM Restorative, Technical Product Profile* at 6, available at http://rdentlab.com/wp-content/uploads/2014/02/Lava-Ultimate-Technical-Product-Profile.pdf (last visited Nov. 15, 2016).

43634

92.    Similarly, in the marketing materials described above, 3M represented, for example, that Lava Ultimate's "innovative characteristics make it especially impressive for implant-supported crowns. And it's reliable in that tough role, just imagine how it will perform in other challenging single-unit indications."[14] 3M specifically listed crowns as an example of a single-unit application in which Lava Ultimate supposedly excelled. 3M never disclosed that Lava Ultimate crowns undergo dimensional changes when exposed to conditions present in every person's mouth.

93.    3M perpetuated its scheme by disclaiming any knowledge of Lava Ultimate's defects. Dentists and the class representatives repeatedly complained about Lava Ultimate's high failure rate, yet 3M feigned ignorance about the product's defects. Rather than accept responsibility, 3M tried to place the blame for the high debond rate of Lava Ultimate on dentists by suggesting that the crowns were applied improperly. 3M updated the guidelines for installing crowns made with Lava Ultimate, but, unsurprisingly, the updated installation protocols did not solve the debond problem; regardless of the installation method, crowns made with Lava Ultimate continued to debond.

94.    Plaintiffs and the class members had no knowledge and no effective way to know that Lava Ultimate was defective. 3M knew that Lava Ultimate was defective and unsuitable for crowns and failed to disclose its inherent defectiveness to Plaintiffs and the

---

[14] *Precision Solutions – Lava Ultimate Implant Crown Restorative* at 5, available at http://solutions.3m.com.tr/3MContentRetrievalAPI/BlobServlet?lmd=1340376057000&locale=en_EU&assetType=MMM_Image&assetId=1319231507546&blobAttribute=ImageFile (last visited Nov. 15, 2016).

43634

class members prior to purchase despite 3M's knowledge of the defect. Plaintiffs contend that additional factual information that would provide further evidence of 3M's misrepresentations is peculiarly within 3M's knowledge or control.

95.     Had Plaintiffs and the class members known of Lava Ultimate's defect, they would not have purchased the material or used it for crowns.

**G.     3M finally acknowledges Lava Ultimate's defect and instructs dentists not to use Lava Ultimate in crowns.**

96.     On June 12, 2015, 3M issued a new protocol for the use of Lava Ultimate and finally acknowledged that Lava Ultimate was not appropriate for crowns. 3M sent a letter to dentists stating that Lava Ultimate should no longer be used for dental crowns. The letter stated: "3M Oral Care is removing the crown indication for Lava Ultimate CAD/CAM Restorative Product because crowns are debonding at a higher-than anticipated rate." In bold print, 3M sent the following warning:

> ***IMPORTANT: Do not use Lava Ultimate restorative for any type of crown because there exists a potential for debonding.***[15]

97.     On June 15, 2015, the FDA classified 3M's letter to dentists as a Class II recall. A Class II recall is defined as: a situation in which use of, or exposure to, a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote.

---

[15]     *3M ESPE Lava Ultimate CAD/CAM Restorative*, available at http://multimedia.3m.com/mws/media/747392O/lava-ultimate-restorative-instructions-for-use-english.pdf (last visited Nov. 15, 2016).

43634

98.     At the time of the recall, 3M had distributed over 1 million of these defective products.

**H.     Lava Ultimate's defects harm dentists.**

99.     Because patients correctly expect that they should not bear the repair costs associated with a defective crown, Plaintiffs and the class members have borne the costs of Lava Ultimate's defects. This is especially problematic because often a debonding crown represents an emergency event that requires prompt attention. The dentist must:

- x-ray the patient,

- administer anesthetic to the patient,

- re-prep the old crown,

- re-clean and prep the tooth,

- reapply the bonding agent, and

- install a new crown.

100.     When debonding occurs, dentists have had to replace the restoration with a new crown with all the attendant time, inconvenience, material and labor costs, and loss of good will incurred by the dentists.

101.     Repairing a failed Lava Ultimate crown typically takes at least two hours and entails significant direct out-of-pocket costs to a dentist and forcing the dentists to unfairly bear the costs of Lava Ultimate's defect.

102.     While 3M has offered to refund some Lava Ultimate inventory that remains in dentists' stocks, 3M has refused compensate dentists for the failed crowns they have had

43634

to replace, cost of their replacement materials, or the time and labor spent repairing the failed Lava Ultimate crowns (or has done so only in secret to select dentists). The class members, including Plaintiffs, have been forced to bear the cost of replacement through no fault of their own.

## CLASS ACTION ALLEGATIONS

103.    Plaintiffs bring this lawsuit as a class action on behalf of themselves, and all others similarly situated as members of the proposed class, under Federal Rules of Civil Procedure 23(a) and (b)(2), and (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

104.    The Nationwide Class is defined as:

> All dentists or dental practices in the United States, Commonwealth of Puerto Rico, U.S. Virgin Islands, and Guam who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

105.    Should the Court not certify a nationwide class, Plaintiffs allege separate classes based upon the applicable laws set forth in the alternative state law counts below. Each class is defined as follows for the claims asserted under a particular jurisdiction's law:

- **California Class:** All dentists or dental practices in California who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **Florida Class:**  All dentists or dental practices in Florida who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **Georgia Class:** All dentists or dental practices in Georgia who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

43634

72

- **Kansas Class:** All dentists or dental practices in Kansas who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **Minnesota Class:** All dentists or dental practices in Minnesota who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **Missouri Class:** All dentists or dental practices in Missouri who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **New Jersey Class:** All dentists or dental practices in New Jersey who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **New Mexico Class:** All dentists or dental practices in New Mexico who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **New York Class:** All dentists or dental practices in New York who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **Pennsylvania Class:** All dentists or dental practices in Pennsylvania who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **Tennessee Class:** All dentists or dental practices in Tennessee who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **Texas Class:** All dentists or dental practices in Texas who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

- **Washington Class:** All dentists or dental practices in Washington who purchased 3M's Lava™ Ultimate Restorative and applied the product as a dental crown between January 1, 2011 and June 12, 2015.

106.    Excluded from all potential Classes are the defendant, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly

43634

73

owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third-degree of relationship to any such persons.

107.    **Numerosity**: Although the exact number of class members is uncertain and can only be ascertained through appropriate discovery, 3M sold and/or distributed over 1 million Lava Ultimate products, and the number of class members is likely to be in the thousands. Joinder under such numbers is impracticable. The disposition of the claims of the class in a single action will provide substantial benefits to all parties and to the Court. Further, the class members are readily identifiable from information and records in 3M's suppliers' possession, custody, or control.

108.    **Typicality:** The representative Plaintiffs' claims are typical of the claims of the class members in that the representative Plaintiffs, like all class members, purchased a common product—Lava Ultimate—made from a common engineering and manufacturing process and used those materials for crowns in their dental practices. The inherent defect and susceptibility to debonding in Lava Ultimate products that Plaintiffs purchased is typical of experiences of all class members. Moreover, Plaintiffs, like all class members, purchased Lava Ultimate in a transaction that was part of 3M's coordinated marketing effort, which was comprised of common representations about Lava Ultimate's suitability for crowns, among other things.

43634

109.   **Commonality**: There are numerous questions of law and fact common to Plaintiffs and the class members, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include the following:

  a. Whether Lava Ultimate was inherently defective;

  b. Whether Lava Ultimate debonds as a result of the defect;

  c. Whether 3M knew about the defect before June 12, 2015 and, if so, how long 3M knew about the defect;

  d. Whether the defective nature of Lava Ultimate constitutes a material fact to a reasonable dentist purchasing restorative material for crowns;

  e. Whether 3M had a duty to disclose the defective nature of Lava Ultimate;

  f. Whether 3M breached implied or express warranties;

  g. Whether 3M engaged in conduct that violated consumer protection statutes;

  h. Whether Plaintiffs and the class members are entitled to equitable relief, including declaratory relief; and

  i. Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

110.   **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of the class members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

111.   **Certification under Federal Rule of Civil Procedure 23(b)(2):** 3M has acted or refused to act on grounds generally applicable to the nationwide class (and the alternative state classes), making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. 3M has refused to acknowledge the

43634

design defect in Lava Ultimate and continues to blame dentists for Lava Ultimate's high level of debonds.

112. **Certification under Federal Rule of Civil Procedure 23(b)(3): Superiority and Predominance**: Plaintiffs and the class members have all suffered and will continue to suffer harm and damages as a result of 3M's wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in this complaint. This class action presents no difficulties in management that would preclude maintenance as a class action.

113. In the alternative, this class can be certified under Federal Rule of Civil Procedure 23(c)(4) with respect to particular issues.

## TOLLING OF THE STATUTE OF LIMITATIONS

114. Plaintiffs and the class members had no realistic opportunity to know that Lava Ultimate was defective and suffered from an abnormally high number of debonds until June 12, 2015—the date on which 3M issued the statement that Lava Ultimate was unsuitable for crowns—and thereafter as patients with existing restorations continue to present with debonding emergencies. In addition, despite their due diligence, Plaintiffs and

43634

the Class could not reasonably have expected to learn or discover that 3M concealed material information about Lava Ultimate until June 12, 2015.

115. 3M continued to actively promote Lava Ultimate as a superior and suitable material for crowns until the product until June 12, 2015.

116. Indeed, when Plaintiffs and the class members notified 3M of Lava Ultimate's high-failure rate, 3M claimed that the dentists' techniques, rather than the product's defect, caused the debonds.

117. 3M's knowledge and active concealment of the defect has tolled any applicable statute of limitation. 3M is estopped from relying on any statute of limitation because the company concealed knowledge about Lava Ultimate's true characteristics.

118. Because Plaintiffs and the class members could not have reasonably known about the factual basis for their claims until (at the earliest) the date on which 3M acknowledged the inherent defect and issued the statement that Lava Ultimate suffered from an abnormally large number of debonds, accrual of their claims did not begin (at the earliest) until June 12, 2015.

**ESTOPPEL**

119. 3M was and is under a continuous duty to disclose to Plaintiffs and the class members the true character, quality, and nature of Lava Ultimate, including their propensity to debond at an abnormally high rate. 3M actively concealed the true character, quality, and nature of Lava Ultimate and knowingly made misrepresentations about the quality, characteristics, and performance of the product. When dentists complained about the

43634

77

product debonding, rather than concede that the product was defective, 3M blamed the dentists' technique. Accordingly, 3M is estopped from relying on any statutes of limitation in defense of this action.

## CAUSES OF ACTION

**A.    Nationwide Class (Or Alternative State Subclass) Under Minnesota Law**

**Count I.    Violation the Minnesota Prevention of Consumer Fraud Act (Minn. Stat.§§ 325F.68, *et seq.*)**

120.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the Minnesota Class.

121.    3M's Lava Ultimate constitutes "merchandise" within the meaning of Minn. Stat. § 325F.68 subd. 2. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise."

122.    The Minnesota CFA prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69 subd. 1. 3M participated in misleading, false, or deceptive acts that violated the Minnesota CFA. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

43634

78

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

43634

123.   In the course of their business, 3M concealed and suppressed material facts concerning Lava Ultimate. 3M did this by failing to disclose the high rate of Lava Ultimate debonds as well as admit that Lava Ultimate had defects that led to such debonds. Plaintiffs and the Class had no way of discerning that 3M's representations about Lava Ultimate were false and misleading. 3M's conduct constituted misleading, false, unfair or deceptive acts or practices that violated the Minnesota CFA. 3M knew or should have known that its conduct violated the Minnesota CFA, and 3M owed Plaintiffs and the Class a duty to disclose the defects.

124.   3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics of Lava Ultimate, including the debonding issue.

125.   Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because they caused Plaintiffs and the Class to purchase Lava Ultimate.

126.   Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate

127.   Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations about the characteristics of Lava

43634

Ultimate. Indeed, Plaintiffs and the Class would not have purchased Lava Ultimate for crowns if the product's true nature had been disclosed, or would have paid significantly less for the product than they did, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

128.    Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

129.    3M's unlawful acts and practices complained of herein affect the public interest. As a direct and proximate result of 3M's violations of the Minnesota CFA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage. Pursuant to Minn. Stat. § 8.31 subd. 3a, Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

130.    Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA. This action will achieve a public benefit. The misrepresentations by 3M were significant and directly contributed to the harm suffered by Plaintiffs. The misrepresentations were made to increase profits at the expense of Plaintiffs and its patients. Plaintiffs seek monetary and injunctive relief, in order to stop further damage to the business of dentists throughout the country.

43634

131.   In the alternative, pursuant to Minn. Stat. §§ 325F.69 subd. 1 and 325F.70 subd. 1, Plaintiffs request that this Court enjoin Defendant from engaging in misrepresentation and deceptive practices.

**Count II.      Violation of Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. §§ 325D.43-48***, et seq.***)**

132.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the Minnesota Class.

133.   The Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, ("Minnesota DTPA") prohibits, *inter alia*, deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised."

134.   In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate had characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate was of a particular standard, quality, or grade, and that Lava Ultimate was of a particular style or model when it was of another; and advertising Lava Ultimate with intent not to sell it as advertised. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

43634

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

43634

83

135.    3M participated in misleading, false, or deceptive acts that violated the Minnesota DTPA. By failing to disclose and by actively concealing the fact that Lava Ultimate would ultimately debond, 3M engaged in deceptive business practices prohibited under the Minnesota DTPA. 3M's actions as set forth above occurred in the conduct of trade or commerce.

136.    In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in deceptive trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

137.    3M knew the true nature of Lava Ultimate's debonding issues since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's debonding issues rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

138.    3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

139.    3M knew or should have known that its conduct violated the Minnesota DTPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

43634

140.    Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because they caused Plaintiffs and the Class to purchase Lava Ultimate.

141.    Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

142.    Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

143.    Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

144.    Pursuant to Minn. Stat. § 8.31 subd. 3a, Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota

43634

DTPA. This action will achieve a public benefit. The misrepresentations by 3M were significant, directed to thousands of dentists, and directly contributed to the harm suffered by Plaintiffs and the Class. The misrepresentations were made to increase profits at the expense of Plaintiffs and their patients. Plaintiffs and the Class seek monetary and injunctive relief, in order to stop further damage to the business of dentists throughout the country.

145.    In the alternative, pursuant to Minn. Stat. § 325D.45, Plaintiffs and the Class are likely to be harmed going forward by the sale and distribution of Lava products. 3M has attempted to inform the public that Lava Ultimate cannot be used for crowns; however, it is still sold for inlays and onlays putting Plaintiffs at risk if they have not yet been informed of the potential dangers of Lava Ultimate. The only way to adequately stop 3M from harming Plaintiffs is through injunctive relief.

146.    3M willfully engaged in deceptive trade practices in violation of the DTPA, and as a result, Plaintiffs and the Class are entitled to costs and attorneys' fees.

**Count III.    Violation of Minnesota Unlawful Trade Practices Act (Minn. Stat. § 325D.09, *et seq.*)**

147.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the Minnesota Class.

148.    The Minnesota Unlawful Trade Practices Act (Minnesota UTPA), Minn. § 325D.13, states that "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

43634

149.   In the course of their business, 3M concealed and suppressed material facts concerning the true quality of Lava Ultimate. 3M did this by failing to disclose the high rate of Lava Ultimate debonds as well as admit that Lava Ultimate had defects that led to such debonds. Plaintiffs and the Class had no way of discerning that 3M's representations about Lava Ultimate were false and misleading. 3M's conduct constituted misleading, false, unfair or deceptive acts or practices that violated the Minnesota CFA. 3M knew or should have known that its conduct violated the Minnesota CFA, and 3M owed Plaintiffs and the Class a duty to disclose the defects

150.   3M's unlawful acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true quality of Lava Ultimate, including the debonding issue. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because they caused Plaintiffs and the Class to purchase Lava Ultimate.

151.   Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

152.   Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations about the characteristics of Lava Ultimate. Indeed, Plaintiffs and the Class would not have purchased Lava Ultimate for crowns if the product's true nature had been disclosed, or would have paid significantly less

43634

for the product than they did, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

153.   Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

154.   In the course of 3M's business, it engaged in unlawful practices by representing that Lava Ultimate had characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate was of a particular standard, quality, or grade, and that Lava Ultimate was of a particular style or model when it was of another; and advertising Lava Ultimate with intent not to sell it as advertised. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

43634

88

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

155.    Pursuant to Minn. § 8.31(3a), Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota UTPA. This action will achieve a public benefit. The misrepresentations by 3M were significant, directed to thousands of dentists, and directly contributed to the harm suffered by Plaintiffs and the Class. The misrepresentations were made to increase profits at the expense of Plaintiffs and their patients. Plaintiffs and the Class seek monetary and injunctive relief, in order to stop further damage to the business of dentists throughout the country.

43634

156.    Additionally, pursuant to Minn. § 325D.15, Plaintiffs and the Class have been harmed and are likely to be harmed going forward by the sale and distribution of Lava products, and are entitled to actual damages, as well as injunctive relief.

**Count IV.    Breach of Express Warranty (Minn. Stat. § 336.2-313)**

157.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the Minnesota Class.

158.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate Product under Minn. Stat. § 336.2-104(1) and a "seller" of Lava Ultimate under § 336.2-103(1)(d).

159.    Lava Ultimate is and was at all relevant times a "good" within the meaning of Minn. Stat. § 336.2-105(1).

160.    Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

43634

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"[16]

161.    3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class relied on 3M's warranties in purchasing Lava Ultimate.

---

[16] Plaintiffs note that 3M also provided an additional express warranty against fracturing. Plaintiffs, however, do not presently assert claims based on that warranty.

43634

162.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

163.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

164.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

165.    Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance

43634

of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

166.    As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count V.       Breach of Implied Warranty (Minn. Stat. § 336.2-314)**

167.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the Minnesota Class.

168.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate products under Minn. Stat. § 336.2-104(1) and a "seller" of Lava Ultimate under § 336.2-103(1)(d).

169.    Lava Ultimate is and was at all relevant times a "good" within the meaning of Minn. Stat. § 336.2-105(1).

170.    A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to Minn. Stat. § 336.2-314.

171.    Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting

43634

in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

172.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

173.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

174.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

43634

**Count VI.       Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301,** *et seq.*

175.    Plaintiff re-alleges and incorporates by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of all the (alternative) state subclassess.

176.    Plaintiff and other the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

177.    3M is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

178.    Lava Ultimate constitutes a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

179.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this lawsuit.

180.    Under the Magnuson-Moss Warranty Act, a warrantor who provides a written warranty cannot disclaim implied warranties.

181.    As described herein, 3M's Lava Ultimate breached express warranties it made as well as the implied warranty of merchantability and fitness.

182.    Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

43634

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

43634

96

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"[17]

183.   3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class relied on 3M's warranties in purchasing Lava Ultimate.

184.   A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law.

185.   Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

186.   3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience

---

[17] Plaintiffs note that 3M also provided an additional express warranty against fracturing. Plaintiffs, however, do not presently assert claims based on that warranty.

43634

with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

187.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

188.    As a direct and proximate result of 3M's breach of the express warranties and implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count VII.   Unjust Enrichment**

189.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the Minnesota Class.

190.    3M has benefitted from selling inherently defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the debonding issues when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

191.    3M has received and retained unjust benefits from the Plaintiffs and Class, and an inequity has resulted.

43634

192.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the Class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

193.    3M knowingly accepted the unjust benefits of its fraudulent conduct and other misconduct.

194.    As a result of 3M's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the Class in an amount to be proven at trial.

**Count VIII.  Fraud**

195.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Nationwide or, in the alternative, on behalf of the Minnesota Class.

196.    As discussed throughout this complaint and alleged extensively above, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns.

197.    3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

198.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts.

43634

199.   Plaintiffs and the class member actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because they caused Plaintiffs and the class members to purchase Lava Ultimate.

200.   Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

201.   Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

202.   Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

203.   3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

43634

**B.      Alternative California Subclass**

**Count I.      Violations of the Consumer Legal Remedies Act (Cal. Civ. Code § 1750,** *et seq.***)**

204.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the California Class.

205.   3M is a "person" under Cal. Civ. Code § 1761(c).

206.   Plaintiffs and the Class are "consumers" under Cal. Civ. Code § 1761(d).

207.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). 3M has engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below by, at a minimum, representing that Lava Ultimate has characteristics, uses, benefits, and qualities which they do not have; representing that Lava Ultimate is of a particular standard, quality, and grade when they are not; advertising Lava Ultimate with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Lava Ultimate has been supplied in accordance with a previous representation when it has not.

208.   In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false,

43634

or deceptive acts that violated the CLRA. By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the CLRA.

209.   3M's actions as set forth above occurred in the conduct of trade or commerce.

210.   In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

211.   3M knew the true nature of Lava Ultimate's high debond rate since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

212.   3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

213.   For example, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

43634

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and ... incredibly durable and shock absorbent"

214.    3M knew or should have known that its conduct violated the CLRA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

43634

215.    Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

216.    Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

217.    Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate

218.    Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it. Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

219.    Plaintiffs seek injunctive relief, in order to stop further damage to the business of dentists throughout the country. 3M has attempted to inform the public that Lava Ultimate

43634

cannot be used for crowns; however, it is still sold for inlays and onlays putting Plaintiffs at risk if they have not yet been informed of the potential dangers of Lava Ultimate. The only way to adequately stop 3M from harming plaintiffs is through injunctive relief.

220.    Plaintiffs and the Class note that they complied with Cal. Civ. Code § 1782's notice requirements by sending written notice via certified or registered mail, return receipt requested, to 3M and 3M's counsel notifying them of Lava Ultimate's defects, the damages that Plaintiffs and the Class suffered, and demanding that 3M provide redress. The undersigned counsel sent the letter on or around October 12, 2016, to which counsel for 3M responded.

**Count II.      Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)**

221.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the California Class.

222.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." 3M has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL. These UCL claims are not necessarily premised on the violation of a separate statute because they may proceed based on fraud and unfairness under the UCL itself.

223.    3M's conduct, described herein, was and is in violation of the UCL. 3M's conduct violated the UCL in at least the following ways: knowingly and intentionally concealing from Plaintiffs and the Class the design defect in Lava Ultimate; and marketing Lava Ultimate as being defect-free, including, but not limited to use in dental crowns.

43634

224.    Specifically, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

43634

106

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

225.   Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because they caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

226.   Plaintiffs and the Class have suffered injury in fact including lost money or property as a result of 3M's misrepresentations and omissions in which 3M stated that Lava Ultimate was appropriate for use in dental crowns. Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

227.   Plaintiffs and the Class seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200.

228.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin 3M from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class any money it acquired by unfair competition, including restitution and/or disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

43634

**Count III.    Violation of California False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et. seq.*)**

229.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the California Class.

230.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

231.    3M caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading. 3M should have known that the statements were untrue and misleading to consumers, including Plaintiffs and the other Class members.

232.    For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

43634

108

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or   failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

43634

233.   3M has violated California Bus. & Prof. Code § 17500 because the misrepresentations and omissions regarding the defects in Lava Ultimate as set forth herein were material and likely to deceive a reasonable consumer.

234.   Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and the Class to believe that Lava Ultimate was appropriate for crowns, because they caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

235.   Plaintiffs and the Class have suffered an injury in fact, including loss of money, as a result of 3M's unfair, unlawful, and/or deceptive practices  in which 3M stated that Lava Ultimate was appropriate for use in dental crowns. Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying any damage the patient suffered due to the crown's defect.

236.   3M's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

237.   Plaintiffs, individually and on behalf of the class members, request that this Court enter such orders or judgments as may be necessary to enjoin 3M from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class

43634

any money 3M acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**Count IV.  Violation of Song-Beverly Consumer Warranty Act for Breach of Express Warranties (Cal. Civ. Code §§ 1791.2 & 1793.2(d))**

238.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the California Class.

239.    Plaintiffs and the Class who purchased Lava Ultimate are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

240.    Lava Ultimate products constitute "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

241.    3M is a "manufacturer" of Lava Ultimate within the meaning of Cal. Civ. Code § 1791(j).

242.    3M manufactured Lava Ultimate as an "assistive device" as defined by the Song-Beverly Act, for the purpose of ultimate retail sale in California.

243.    Plaintiffs and the Class bought Lava Ultimate manufactured by 3M.

244.    3M made express warranties to Plaintiffs and the Class within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described herein.

245.    The warranties noted herein formed the basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate products. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

43634

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

43634

246.    Plaintiffs and the Class experienced defects within the warranty period. Despite the existence of warranties, 3M failed to timely Plaintiffs and the Class about Lava Ultimate's design defect, and 3M did not promptly replace or buy back the products.

247.    As a result of 3M's breach of its express warranties, Plaintiffs and the Class received goods whose condition substantially impaired the value of the goods. Plaintiffs and the Class have been damaged as a result of the diminished value of the Lava Ultimate products, the products' defect.

248.    Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of the Lava Ultimate products, or the overpayment or diminution in value of the products. Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the Class are entitled to costs and attorneys' fees.

**Count V.      Breach of Express Warranty (Cal. Com. Code § 2313)**

249.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the California Class.

250.    3M was at all relevant times a "merchant" with respect to the Lava Ultimate products under Cal. Com. Code § 2104(1) and a "seller" of Lava Ultimate under § 2103(1)(d).

251.    Lava Ultimate products were at all relevant times a "good" within the meaning of Cal. Com. Code § 2105(1).

43634

113

252.   Among other things, 3M expressly warranted the following about Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

43634

114

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"[18]

253.    3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class relied on 3M's warranties in purchasing Lava Ultimate. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because they caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

254.    Plaintiffs provided notice to and attempted to cure in communications with 3M. 3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed

---

[18] Plaintiffs note that 3M also provided an additional express warranty against fracturing. Plaintiffs, however, do not presently assert claims based on that warranty.

43634

in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

255.    Moreover, allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

256.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

257.    Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

258.    As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

43634

**Count VI.     Breach of Implied Warranty (Cal. Com. Code § 2314)**

259.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the California Class.

260.   3M is and was at all relevant times a "merchant" with respect to Lava Ultimate products under Cal. Com. Code § 2104(1) a "seller" of Lava Ultimate under § 2103(1)(d).

261.   Lava Ultimate is and was at all relevant times a "good" within the meaning of Cal. Com. Code § 2105(1).

262.   A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to Cal. Com. Code § 2314.

263.   Lava Ultimate, when sold and at all relevant times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

264.   3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed

43634

in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

265.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count VII.   Unjust Enrichment**

266.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the California Class.

267.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

268.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

269.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

270.    3M knowingly accepted the unjust benefits of its fraudulent conduct and other misconduct.

43634

271.    As a result of 3M's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the class in an amount to be proven at trial.

**Count VIII.  Fraud**

272.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the California Class.

273.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

274.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because they caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

275.    Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class

43634

119

members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

276.  Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

277.  3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**C.  Alternative Florida Subclass**

**Count I.      Violation of Florida's Unfair & Deceptive Trade Practices Act (Fla. Stat. § 501.210, *et seq.*)**

278.  Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Florida Class.

279.  Plaintiffs are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

280.  3M is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

281.  FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

43634

120

282.   3M has engaged in unfair or deceptive acts or practices that violated the FUDTPA as described above and below by, at a minimum, representing that Lava Ultimate has characteristics, uses, benefits, and qualities which they do not have; representing that Lava Ultimate is of a particular standard, quality, and grade when they are not; advertising Lava Ultimate with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Lava Ultimate has been supplied in accordance with a previous representation when it has not.

283.   In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false, or deceptive acts that violated the FUDTPA. By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the FUDTPA. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

43634

121

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

284.   3M's actions as set forth above occurred in the conduct of trade or commerce.

285.   In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

43634

122

concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

286.    3M knew the true nature of Lava Ultimate's high debond rate since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

287.    3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

288.    3M knew or should have known that its conduct violated the FUDTPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

289.    Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein. And Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various

costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

290.    Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

291.    Plaintiffs and the Florida Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

292.    Plaintiffs seek injunctive relief, in order to stop further damage to the business of dentists throughout the country and from otherwise harming Plaintiffs and the Florida Class. 3M has attempted to inform the public that Lava Ultimate cannot be used for crowns; however, it is still sold for inlays and onlays putting Plaintiffs at risk if they have not yet been informed of the potential dangers of Lava Ultimate.

**Count II.    Breach of Express Warranty (Fla. Stat. § 672.313)**

293.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Florida Class.

294.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Fla. Stat. § 672.104(1) and a "seller" of Lava Ultimate under 672.103(1)(d).

295.    Lava Ultimate products were at all relevant times "goods" under Fla. Stat. § 672.105(1).

296.    Among other things, 3M expressly warranted the following as to Lava Ultimate:

43634

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

43634

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"[19]

297.    3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class relied on 3M's warranties in purchasing Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

298.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

---

[19] Plaintiffs note that 3M also provided an additional express warranty against fracturing. Plaintiffs, however, do not presently assert claims based on that warranty.

43634

299.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

300.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

301.    Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

302.    As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count III.    Breach of Implied Warranty (Fla. Stat. § 672.314)**

303.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs brings this claim on behalf of themselves and the Florida Class.

43634

127

304.   3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Fla. Stat. § 672.104(1) and a "seller" of Lava Ultimate under 672.103(1)(d).

305.   Lava Ultimate products were at all relevant times "goods" under Fla. Stat. § 672.105(1).

306.   A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to Fla. Stat. § 672.314.

307.   Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

308.   3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

43634

309.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

310.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count IV.    Unjust Enrichment**

311.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Florida Class.

312.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

313.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

314.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

43634

**Count V.      Fraud**

315.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Florida Class.

316.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

317.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

43634

130

318.    Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

319.    3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**D.      Alternative Georgia Subclass**

**Count I.       Violation of Georgia's Fair Business Practices Act (Ga. Code § 10-1-390, *et seq.*)**

320.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Georgia Class.

321.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code § 10-1-393(b).

322.    3M has engaged in unfair or deceptive acts or practices that violated the Georgia FBPA as described above and below by, at a minimum, representing that Lava

43634

131

Ultimate has characteristics, uses, benefits, and qualities which they do not have; representing that Lava Ultimate is of a particular standard, quality, and grade when they are not; advertising Lava Ultimate with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Lava Ultimate has been supplied in accordance with a previous representation when it has not.

323.   In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false, or deceptive acts that violated the Georgia FBPA. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or   failure

43634

132

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

324.   By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the Georgia FBPA.

325.   3M's actions as set forth above occurred in the conduct of trade or commerce.

326.   In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

43634

133

327.    3M knew the true nature of Lava Ultimate's high debond rate since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

328.    3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

329.    3M knew or should have known that its conduct violated the Georgia FBPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

330.    Plaintiffs and the Class relied on 3M's misrepresentations and omission and suffered ascertainable loss and actual damages as a direct and proximate result of those misrepresentations and the concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

331.    Plaintiffs did not receive the benefit of their bargain because of 3M's misconduct.

43634

332.   Plaintiffs and the Georgia Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code § 10-1-399(a).

333.   Plaintiffs also seek an order enjoining 3M's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code § 10-1-399.

334.   Plaintiffs and the Class note that they complied with the statute's 30-day written notice requirement by sending written notice via certified or registered mail, return receipt requested, to 3M and 3M's counsel notifying them of Lava Ultimate's defects, the damages that Plaintiffs and the Class suffered, and demanding that 3M provide redress. This letter expressly mentioned the violation of Georgia's Fair Business Practices Act. The undersigned counsel sent the letter on or around October 12, 2016.

**Count II.    Violation of Georgia's Uniform Deceptive Trade Practices Act (Ga. Code § 10-1-370)**

335.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Georgia Class.

336.   3M, Plaintiffs, and the Georgia Class are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code § 10-1-371(5).

337.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code § 10-1-372(a).

43634

338.   In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate had characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate was of a particular standard, quality, or grade, and that Lava Ultimate was of a particular style or model when it was of another; and advertising Lava Ultimate with intent not to sell it as advertised. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

43634

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and ... incredibly durable and shock absorbent"

339.   3M participated in misleading, false, or deceptive acts that violated the Georgia UDTPA. By failing to disclose and by actively concealing the fact that Lava Ultimate would ultimately debond, 3M engaged in deceptive business practices prohibited under the Georgia UDTPA.

340.   3M's actions as set forth above occurred in the conduct of trade or commerce.

341.   In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

342.   3M knew the true nature of Lava Ultimate's debonding issues since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's debonding issues rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

43634

343.   3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

344.   3M knew or should have known that its conduct violated the Georgia UDTPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

345.   Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying any damage the patient

43634

suffered due to the crown's defect. Plaintiffs and the Class did not receive the benefit of the bargain because of 3M's misconduct.

346.   Plaintiffs seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code § 10-1-373.

**Count III.   Breach of Express Warranty (Ga. Code § 11-2-313)**

347.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Georgia Class.

348.   3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Ga. Code § 11-2-104 and a "seller" of Lava Ultimate under 11-2-103.

349.   Lava Ultimate products were at all relevant times "goods" under Ga. Code § 11-2-105(1).

350.   Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

43634

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"[20]

351.   3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class relied on 3M's

---

[20] Plaintiffs note that 3M also provided an additional express warranty against fracturing. Plaintiffs, however, do not presently assert claims based on that warranty.

43634

warranties in purchasing Lava Ultimate. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

352.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

353.    3M was also provided notice of these issues by numerous complaints that dentists made against them. 3M settled many of these disputes before litigation was commenced. The current complaint also provides notice to 3M. Alternatively, Plaintiffs were excused from providing notice.

43634

354.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

355.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

356.    Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

357.    3M was provided notice of these issues by numerous complaints filed against them, including the instant Complaint.

358.    As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

43634

142

**Count IV.     Breach of Implied Warranty (Ga. Code § 11-2-314)**

359.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Georgia Class.

360.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Ga. Code § 11-2-104(1) and a "seller" of Lava Ultimate under § 11-2-103(1)(d).

361.    Lava Ultimate products were at all relevant times "goods" under Ga. Code § 11-2-105(1).

362.    A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied under Tennessee law.

363.    Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

364.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed

43634

in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

365.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

366.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count V.    Unjust Enrichment**

367.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Georgia Class.

368.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

369.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

43634

370.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the Class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

**Count VI.    Fraud**

371.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Georgia Class.

372.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

373.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to

43634

defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

374.    Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

375.    3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**E.     Alternative Kansas Subclass**

**Count I.     Violation of Kansas Consumer Protection Act (Kan. Stat. § 50-623, *et seq*.)**

376.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Kansas Class.

377.    3M is a "supplier" under § 50-624(*l*) of the Kansas Consumer Protection Act ("CPA").

378.    Plaintiffs are "consumers" under § 50-624(b) the Kansas CPA.

379.    The sale of the Lava Ultimate products was a "consumer transaction" within the meaning of Kan. Stat. § 50-624(c).

380.    The Kansas CPA provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations "or with reason

43634

146

to know that: (A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. § 50-627(a).

381.   In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false, or deceptive acts that violated Kansas CPA. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

43634

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or   failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

382.   By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the Kansas CPA.

383.   3M's actions as set forth above occurred in the conduct of trade or commerce.

43634

384.   3M knew the true nature of Lava Ultimate's high debond rate since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

385.   3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

386.   3M knew or should have known that its conduct violated the Kansas CPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

387.   Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true

43634

nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

388.   Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

389.   Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under Kansas CPA. This action will achieve a public benefit. The misrepresentations by 3M was significant and directly contributed to the harm suffered by Plaintiffs and the Class. The misrepresentations were made to increase profits at the expense of Plaintiffs and their patients. Plaintiffs and the Class seek monetary and injunctive relief, in order to stop further damage to the business of dentists throughout the country.

390.   Plaintiffs and the Class are likely to be harmed going forward by the sale and distribution of Lava products. 3M has attempted to inform the public that Lava Ultimate cannot be used for crowns; however, it is still sold for inlays and onlays putting Plaintiffs at risk if they have not yet been informed of the potential dangers of Lava Ultimate. The only way to adequately stop 3M from harming plaintiffs is through injunctive relief. 3M willfully engaged in deceptive trade practices in violation of the Kansas CPA, and as a result, Plaintiffs and the Class are entitled to costs and attorneys' fees.

43634

## Count II.  Breach of Express Warranty (Kan. Stat. § 84-2-313)

391.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Kansas Class.

392.   3M is and was at all relevant times a "merchant" with respect to Lava Ultimate Product under Kan. Stat. § 84-2-104(1) and a "seller" under § 84-2-103(1)(d).

393.   Lava Ultimate was a "good" within the meaning of Kan. Stat. § 84-2-105(1).

394.   Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

43634

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"[21]

395.   3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class relied on 3M's warranties in purchasing Lava Ultimate. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

---

[21] Plaintiffs note that 3M also provided an additional express warranty against fracturing. Plaintiffs, however, do not presently assert claims based on that warranty.

43634

396.   3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

397.   Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

398.   Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

399.   Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance

43634

of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

400.   As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count III.    Breach of Implied Warranty (Kan. Stat. § 84-2-314)**

401.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Kansas Class.

402.   3M is and was at all relevant times a "merchant" with respect to Lava Ultimate products under Kan. Stat. § 84-2-104(1) and a "seller" of Lava Ultimate products under § 84-2-103(1)(d).

403.   Lava Ultimate is and was at all relevant times a "good" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h)).

404.   A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law.

405.   Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

43634

154

406.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

407.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

408.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count IV.    Unjust Enrichment**

409.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Kansas Class.

43634

410.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

411.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

412.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

**Count V.    Fraud**

413.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Kansas Class.

As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

414.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs

43634

156

and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

415.    Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

416.    3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## F.    Alternative Missouri Subclass

**Count I.    Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*)**

417.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the members of the Missouri Class.

43634

418.   3M, Plaintiffs, and the Missouri Class are "persons" under Mo. Rev. Stat. § 407.010(5).

419.   3M engaged in "trade or commerce" under Mo. Rev. Stat. § 407.010(7) during the relevant time periods.

420.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

421.   3M has engaged in unfair or deceptive acts or practices that violated the Missouri MPA as described above and below by, at a minimum, representing that Lava Ultimate has characteristics, uses, benefits, and qualities which they do not have; representing that Lava Ultimate is of a particular standard, quality, and grade when they are not; advertising Lava Ultimate with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Lava Ultimate has been supplied in accordance with a previous representation when it has not.

422.   In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false,

or deceptive acts that violated the Missouri MPA. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

43634

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

423.   By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the Missouri MPA.

424.   3M's actions as set forth above occurred in the conduct of trade or commerce.

425.   In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

426.   3M knew the true nature of Lava Ultimate's high debond rate since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

427.   3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

43634

428. 3M knew or should have known that its conduct violated the Missouri MPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

429. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions and suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

430. Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

431. Pursuant to Mo. Rev. Stat. § 407.025., Plaintiffs and the Missouri Class seek an order enjoining 3M's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Missouri MPA.

43634

**Count II.    Breach of Express Warranty (Mo. Stat. § 400.2-313)**

432.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Missouri Class

433.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Mo. Stat. § 400.2-104 and a "seller" of Lava Ultimate under § 400.2-103(1)(d).

434.    Lava Ultimate products were at all relevant times "goods" under Mo. Stat. § 400.2-105(1).

435.    Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

43634

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

436.    3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class relied on 3M's warranties in purchasing Lava Ultimate. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

43634

437.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

438.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

439.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

440.    Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance

43634

164

of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

441.    As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count III.    Breach of Implied Warranty (Mo. Stat. § 400.2-314)**

442.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Missouri Class.

443.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Mo. Stat. § 400.2-104(1) and a "seller" of Lava Ultimate under § 400.2-103(1)(d).

444.    Lava Ultimate products were at all relevant times "goods" under Mo. Stat. § 400.2-105(1).

445.    A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to Mo. Stat. § 400.2-314.

446.    Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

43634

447.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

448.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

449.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count IV.    Unjust Enrichment**

450.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Missouri Class.

43634

451.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

452.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

453.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

**Count V.      Fraud**

454.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Missouri Class.

455.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

456.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs

43634

and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

457.   Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

458.   3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**G.     Alternative New Jersey Subclass**

**Count I.     Breach of Express Warranty (N.J. Stat. § 12A:2-313)**

459.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the New Jersey Class.

43634

460.    3M was at all relevant times a "merchant" with respect to the Lava Ultimate products under N.J. Stat. § 12A:2-104(1) and a "seller" of Lava Ultimate under § 2-103(1)(d).

461.    Lava Ultimate products were at all relevant times "goods" within the meaning of N.J. Stat. § 12A:2-105(1).

462.    Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

43634

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

463.    3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class relied on 3M's warranties in purchasing Lava Ultimate.

464.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

465.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate

43634

debonds and should no longer be used for crowns. 3M's admissions are proof that the product fails in its essential purpose.

466. Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

467. Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages.

468. As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count II.     Breach of Implied Warranty (N.J. Stat. §§ 12A:2-314 and 2A-212)**

469. Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and New Jersey Class.

470. 3M was at all relevant times a "merchant" with respect to the Lava Ultimate products under N.J. Stat. § 12A:2-104(1) and a "seller" of Lava Ultimate under § 2-103(1)(d).

43634

471.    Lava Ultimate products were at all relevant times "goods" within the meaning of N.J. Stat. § 12A:2-105(1).

472.    A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to N.J. Stat. §12A:2-314.

473.    Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

474.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

475.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate

43634

debonds and should no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose.

476.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count III.    Violations of The New Jersey Consumer Fraud Act (N.J. Stat. §§ 56:8-1, *et seq.*)**

477.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the New Jersey Class.

478.    Plaintiffs, the New Jersey Class members and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

479.    3M engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (e). 3M's actions as set forth herein occurred in the conduct of trade or commerce.

480.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. § 56:8-2.

43634

173

481.   In the course of their business, 3M concealed and suppressed material facts concerning Lava Ultimate. 3M did this by failing to disclose that Lava Ultimate debonds as well as admit that Lava Ultimate had defects that led to such debonding. Plaintiffs and the Class had no way of discerning that 3M's representations about Lava Ultimate were false and misleading. 3M's conduct constituted misleading, false, unfair or deceptive acts or practices that violated the New Jersey CFA. 3M knew or should have known that its conduct violated the New Jersey CFA, and 3M owed Plaintiffs and the Class a duty to disclose the defects.

482.   3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics of Lava Ultimate, including the high debond rate. Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations about the characteristics of Lava Ultimate. Indeed, Plaintiffs and the Class would not have purchased Lava Ultimate for crowns if the product's true nature had been disclosed, or would have paid less for the product than they did, which also shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

483.   Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

43634

484.    3M's unlawful acts and practices complained of herein affect the public interest. As a direct and proximate result of 3M's violations of the New Jersey CFA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage. Pursuant to N.J. Stat. § 56:8-19, Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the New Jersey CFA.

**Count IV.    Unjust Enrichment**

485.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the New Jersey Class.

486.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the fact the products would debond when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

487.    3M has received and retained unjust benefits from the Plaintiffs and Class, and an inequity has resulted.

488.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the Class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

489.    3M knowingly accepted the unjust benefits of its fraudulent conduct and other misconduct.

43634

490.   As a result of 3M's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the Class in an amount to be proven at trial.

**Count V.     Fraud**

491.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the New Jersey the class members.

492.   As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

493.   Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to

43634

defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

494.    Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

495.    3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**H.    Alternative New Mexico Subclass**

**Count I.    Violations of New Mexico's Unfair Trade Practices Act (N.M. Stat. § 57-12-1, *et seq.*)**

496.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the New Mexico Class.

497.    Plaintiffs are or were "person[s]" under the New Mexico Unfair and Deceptive Trade Practices Act (the "New Mexico UTPA"), N.M. Stat. § 57-12-2.

498.    3M's actions as set forth in this complaint occurred in the conduct of "trade" or "commerce" as defined under N.M. Stat. § 57-12-2.

499.    The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead

43634

any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. § 57-12-2(D).

500.    3M has engaged in unfair or deceptive acts or practices that violated the New Mexico UTPA as described above and below by, at a minimum, representing that Lava Ultimate has characteristics, uses, benefits, and qualities which they do not have; representing that Lava Ultimate is of a particular standard, quality, and grade when they are not; advertising Lava Ultimate with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Lava Ultimate has been supplied in accordance with a previous representation when it has not.

501.    In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false, or deceptive acts that violated the New Mexico UTPA. By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the New Mexico UTPA. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

43634

178

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

502.    In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade

43634

179

practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

503.   3M knew the true nature of Lava Ultimate's high debond rate since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

504.   3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

505.   3M knew or should have known that its conduct violated the New Mexico UTPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

506.   Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various

43634

costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

507.    Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

508.    In addition, 3M's actions constitute unconscionable actions under N.M. Stat. § 57-12-2(E), since it took advantage of the lack of knowledge, ability, experience, and capacity of the New Mexico Class members to a grossly unfair degree.

509.    Because 3M's unconscionable, willful conduct caused actual harm to New Mexico Class members, the New Mexico Class seeks recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. § 57- 12-10

**Count II.      Breach of Express Warranty (N.M. Stat. § 55-2-313)**

510.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Florida Class.

511.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under N.M. Stat. § 55-2-104 and a "seller" of Lava Ultimate under § 55-2-103(1)(d).

512.    Lava Ultimate products were at all relevant times "goods" under N.M. Stat. § 55-2-105(1).

43634

513.   Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

43634

182

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and ... incredibly durable and shock absorbent"

514.   3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

515.   3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

43634

516.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

517.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

518.    Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

519.    As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count III.    Breach of Implied Warranty (N.M. Stat. § 55-2-314)**

520.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs brings this claim on behalf of themselves and the Florida Class.

43634

184

521.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under N.M. Stat. § 55-2-104 and a "seller" of Lava Ultimate under § 55-2-103(1)(d).

522.    Lava Ultimate products were at all relevant times "goods" under N.M. Stat. § 55-2-105(1).

523.    A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to N.M. Stat. § 55-2-314.

524.    Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

525.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

43634

526.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

527.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count IV.    Fraud**

528.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the New Jersey the class members.

529.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

530.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs

43634

and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

531.   Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

532.   3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**I.     Alternative New York Subclass**

**Count I.     Violations of New York General Business Law § 349 (N.Y. Gen. Bus. Law § 349)**

533.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the New York Class.

534.   3M, Plaintiffs, and the New York Class are "persons" under N.Y. Gen. Bus. Law § 349(h).

43634

535.    3M engaged in "trade or commerce" under N.Y. Gen. Bus. Law. § 349(a) during the relevant time periods.

536.    The statute makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

537.    3M has engaged in unfair or deceptive acts or practices that violated the statute as described above and below by, at a minimum, representing that Lava Ultimate has characteristics, uses, benefits, and qualities which they do not have; representing that Lava Ultimate is of a particular standard, quality, and grade when they are not; advertising Lava Ultimate with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Lava Ultimate has been supplied in accordance with a previous representation when it has not.

538.    In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false, or deceptive acts that violated the statute. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

43634

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

539.   By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the statute.

43634

540.    3M's actions as set forth above occurred in the conduct of trade or commerce.

541.    In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

542.    3M knew the true nature of Lava Ultimate's high debond rate since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

543.    3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

544.    3M knew or should have known that its conduct violated the statute. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

545.    Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that

43634

Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

546.   Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

As a result of the foregoing willful, knowing, and wrongful conduct of 3M, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the statute.

**Count II.     Violations of New York General Business Law § 350 (N.Y. Gen. Bus. Law § 350)**

547.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the New York Class.

548.   3M was engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

549.   The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal

43634

191

facts material in light of . . . representations [made] with respect to the commodity . . . ."

N.Y. Gen. Bus. Law § 350-a.

550.   3M caused to be made or disseminated through New York and the United States, through advertising, marketing and other publications, statements that were untrue or misleading. 3M should have known that the statements were untrue and misleading to consumers, including Plaintiffs and the other Class members.

551.   For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

-  "bounce back" and absorbed more stress without suffering permanent deformation or   failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

43634

192

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

552.   3M has violated the NY FAA because the misrepresentations and omissions regarding the defects in Lava Ultimate as set forth herein were material and likely to deceive a reasonable consumer.

553.   Plaintiffs and the Class have suffered an injury in fact, including loss of money, as a result of 3M's unfair, unlawful, and/or deceptive practices. 3M's misrepresentations and omissions alleged herein caused Plaintiffs and other the class members to make their purchase of Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the

43634

product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

554.   3M's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of New York and nationwide.

555.   Plaintiffs, individually and on behalf of the class members, seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York class members. Because 3M's conduct was committed willingly and knowingly, New York class members are entitled to recover three times actual damages, up to $10,000.

556.   The New York Class also seeks an order enjoining 3M's false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

## Count III.   Breach of Express Warranty (N.Y. U.C.C. Law §§ 2-313 and 2a-210)

557.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the New York Class.

558.   3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under N.Y. U.C.C. Law § 2-104 and a "seller" of Lava Ultimate under § 2-103(1)(d).

559.   Lava Ultimate products were at all relevant times "goods" under N.Y. U.C.C. Law § 2-105(1).

560.   Among other things, 3M expressly warranted the following as to Lava Ultimate:

43634

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

43634

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

561.    3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate.

562.    Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

563.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

43634

564.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

565.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

566.    Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

567.    As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count IV.    Breach of Implied Warranty of Merchantability (N.Y. U.C.C. Law § 2-314)**

568.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the New York Class.

43634

569.   3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under N.Y. U.C.C. Law § 2-104(1) and a "seller" of Lava Ultimate under § 2-103(1)(d).

570.   Lava Ultimate products were at all relevant times "goods" under N.Y. U.C.C. § 2-105(1).

571.   A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to N.Y. U.C.C. Law § 2-314.

572.   Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

573.   3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

43634

574.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

575.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count V.    Unjust enrichment**

576.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the New York Class.

577.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

578.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

579.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

43634

**Count VI.    Fraud**

580.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the New York the class members.

581.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

582.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M. 3M's conduct warrants an assessment of punitive damages in an amount

43634

sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**J.      Alternative Pennsylvania Subclass**

**Count I.      Breach of Express Warranty (13 Pa. Cons. Stat. § 2313)**

583.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Pennsylvania Class.

584.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under 13 Pa. Cons. Stat. § 2104 and a "seller" of Lava Ultimate under § 2103(a).

585.    Lava Ultimate products were at all relevant times "goods" under 13 Pa. Cons. Stat. § 2105(a).

586.    Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

43634

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

587.   3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have

43634

202

purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

588.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

589.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

590.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

43634

203

591.   Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

592.   As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count II.      Breach of Implied Warranty (13 Pa. Cons. Stat. § 2314)**

593.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Pennsylvania Class.

594.   3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under 13 Pa. Cons. Stat. § 2104 and a "seller" of Lava Ultimate under § 2103(a).

595.   Lava Ultimate products were at all relevant times "goods" under 13 Pa. Cons. Stat. § 2105(a).

596.   A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to 13 Pa. Cons. Stat. § 2314.

597.   Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting

43634

in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

598.   3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

599.   Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

600.   As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

43634

**Count III.    Unjust Enrichment**

601.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Pennsylvania Class.

602.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

603.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

604.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

**Count IV.    Fraud**

605.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Pennsylvania Class.

606.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

607.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented

43634

and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

608.   Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

609.   Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M. 3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**K.      Alternative Tennessee Subclass**

**Count I.       Breach of Express Warranty (Tenn. Code § 47-2-313)**

610.   Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Tennessee Class.

43634

207

611.  3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of Lava Ultimate under § 47-2-103(1)(d).

612.  Lava Ultimate products were at all relevant times "goods" under Tenn. Code §§ 47-2-105(1).

613.  Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

43634

208

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

614.    3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate.

615.    Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

616.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications

43634

sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

617.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

618.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

619.    Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate

43634

products currently owned, and for such other incidental and consequential damages as allowed.

620.    As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count II.    Breach of Implied Warranty (Tenn. Code § 47-2-313)**

621.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Tennessee Class.

622.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of Lava Ultimate under § 47-2-103(1)(d).

623.    Lava Ultimate products were at all relevant times "goods" under Tenn. Code §§ 47-2-105(1).

624.    A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied under Tennessee law.

625.    Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

43634

626.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

627.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

628.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count III.    Unjust Enrichment**

629.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Tennessee Class.

43634

630.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

631.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

632.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

**Count IV.    Fraud**

633.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Tennessee Class.

634.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

635.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs

43634

213

and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

636.    Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

637.    3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.


**L.    Alternative Texas Subclass**

**Count I.    Violation of the Deceptive Trade Practices Act-Consumer Protection Act (Tex. Bus. & Com. Code §§17.41, et seq.)**

638.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Texas Class.

43634

214

639.   Plaintiffs and the Texas Class are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

640.   3M is a "person" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

641.   3M was engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

642.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

643.   3M has engaged in unfair or deceptive acts or practices that violated the Texas DTPA as described above and below by, at a minimum, representing that Lava Ultimate has characteristics, uses, benefits, and qualities which they do not have; representing that Lava Ultimate is of a particular standard, quality, and grade when they are not; advertising Lava Ultimate with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Lava Ultimate has been supplied in accordance with a previous representation when it has not.

43634

644.   In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false, or deceptive acts that violated the Texas DTPA. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or   failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

43634

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

645.    By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the Texas DTPA.

646.    3M's actions as set forth above occurred in the conduct of trade or commerce.

647.    In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

648.    3M knew the true nature of Lava Ultimate's high debond rate since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's

43634

high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

649.   3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

650.   3M knew or should have known that its conduct violated the Texas DTPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

651.   Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

652.   Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

653.   Pursuant to Tex. Bus. & Com. Code § 17.50, Plaintiffs and the Texas Class seek an order enjoining 3M's unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive

43634

218

damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA. 2996.

654.    On September 21, 2015, certain Plaintiffs sent a letter complying with Tex. Bus. & Com. Code § 17.505(a). Because 3M failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Texas Class are entitled.

**Count II.        Breach of Express Warranty (Tex. Bus. & Com. Code § 2.313)**

655.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Texas Class.

656.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Tex. Bus. & Com. Code § 2.104(1) and a "seller" of Lava Ultimate under § 2.103(a)(4).

657.    Lava Ultimate products were at all relevant times "goods" under Tex. Bus. & Com. Code § 2.105(a).

658.    Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

43634

219

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

659.    3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate. Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those

43634

220

misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

660.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

661.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

662.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava

43634

221

Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

663. Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

664. As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count III.    Breach of Implied Warranty (Tex. Bus. & Com. Code § 2.314)**

665. Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Texas Class.

666. 3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Tex. Bus. & Com. Code § 2.104(1) and a "seller" of Lava Ultimate under § 2.103(a)(4).

667. Lava Ultimate products were at all relevant times "goods" under Tex. Bus. & Com. Code § 2.105(a). Tex. Bus. & Com. Code §§ 2.314 and 2A.212

668. A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

43634

669.   Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

670.   3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

671.   Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

43634

672.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**Count IV.    Fraud**

673.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Texas Class.

674.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

675.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to

43634

224

defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

676.    Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

677.    3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**Count V.    Unjust Enrichment**

678.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Texas Class.

679.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

680.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

681.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

43634

**M.     Alternative Washington Subclass**

**Count I.     Violation of the Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86.010, *et seq.*)**

682.     Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the members of the Washington Class.

683.     3M, Plaintiffs, and the Washington Class "persons" under Wash. Rev. Code § 19.86.010(2).

684.     3M engaged in "trade or commerce" under Wash. Rev. Code § 19.86.010(2) during the relevant time periods.

685.     The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

686.     3M has engaged in unfair or deceptive acts or practices that violated the Washington CPA as described above and below by, at a minimum, representing that Lava Ultimate has characteristics, uses, benefits, and qualities which they do not have; representing that Lava Ultimate is of a particular standard, quality, and grade when they are not; advertising Lava Ultimate with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Lava Ultimate has been supplied in accordance with a previous representation when it has not.

687.     In the course of 3M's business, it engaged in deceptive practices by representing that Lava Ultimate has characteristics, ingredients, uses, benefits, or qualities

43634

that it does not have; representing that Lava Ultimate is a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Lava Ultimate with intent not to sell it as advertised. 3M participated in misleading, false, or deceptive acts that violated the Washington CPA. For example, among other things, 3M misrepresented the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

43634

227

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

688.   By failing to disclose and by actively concealing the high debond rates of Lava Ultimate 3M engaged in deceptive business practices prohibited under the Washington CPA.

689.   3M's actions as set forth above occurred in the conduct of trade or commerce.

690.   In the course of its business, 3M willfully failed to disclose and actively concealed the high debond rates of Lava Ultimate. 3M also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Lava Ultimate.

691.   3M knew the true nature of Lava Ultimate's high debond rate since well before it publicly acknowledged the defect on June 12, 2015. Before acknowledging such defects, 3M had entered into confidential settlements with dentists based on Lava Ultimate's high debond rates in 2014. Indeed, in September 2014, 3M circulated a questionnaire to dentists asking for information about debond rates.

43634

692.    3M intentionally and knowingly misrepresented material facts regarding Lava Ultimate with the intent to mislead Plaintiffs and the Class.

693.    3M knew or should have known that its conduct violated the Washington CPA. And 3M's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiffs and the Class about the true characteristics and value of Lava Ultimate.

694.    Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of 3M's misrepresentations and its concealment of and failure to disclose material information about Lava Ultimate. Plaintiffs and the Class who purchased Lava Ultimate would not have purchased Lava Ultimate if the products' true nature had been disclosed, or would have paid significantly less for it, which shows that Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions. Also, Plaintiffs and the Class bore the costs of the product's defect, which include the various costs associated with reapplying the crown and/or remedying damage the patient suffered due to the crown's defect.

695.    Plaintiffs did not receive the benefit of their bargain as a result of 3M's misconduct.

696.    Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs and the Washington Class seek an order enjoining 3M's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Washington CPA.

43634

**Count II.     Breach of Express Warranty (Wash. Rev. Code § 62A.2-313)**

697.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Washington Class.

698.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Wash. Rev. Code § 62A.2-104 and a "seller" of Lava Ultimate under § 62A.2-103.

699.    Lava Ultimate products were at all relevant times "goods" under Wash. Rev. Code § 62A.2-105(1).

700.    Among other things, 3M expressly warranted the following as to Lava Ultimate:

- "indicated" for crowns

- "especially advantageous for crowns over implants"

- "especially impressive for implant-supported crowns"

- "ideally suited for implant supported restorations because of its high flexural strength and low wear"

- better ability "give way" as compared to glass ceramic materials

- "multiple benefits that this unique Resin Nano Ceramic material can provide compared to glass ceramic materials"

- "perform similarly to or better than glass ceramic and composite materials"

- "bounce back" and absorbed more stress without suffering permanent deformation or failure

43634

- "tough, resilient and durable"

- "high flexural strength"

- "tough material with excellent resiliency"

- "incredibly durable and shock absorbent"

- "allows dentists to easily make adjustments"

- "dentists can adjust the material for occlusion with additive and subtractive techniques"

- "high fracture toughness, flexural strength and resiliency"

- "excellent durability"

- "Repairability" [sic]

- "unique in durability"

- "resilient, not brittle, and . . . incredibly durable and shock absorbent"

701.    3M's express warranties formed a basis of the bargain that was reached when Plaintiffs and the Class purchased Lava Ultimate.

702.    Plaintiffs and the Class actually relied on 3M's misrepresentations and omissions alleged herein, which led Plaintiffs and Class to believe that Lava Ultimate was appropriate for crowns, because such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative

43634

restoration materials that did not contain the defect and which did not debond at an unacceptable high rate.

703.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

704.    Allowing 3M additional opportunity to cure its breach of express warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

705.    Moreover, as alleged in more detail herein, at the time that 3M warranted and sold Lava Ultimate, it knew that the product was inherently defective and did not conform to its warranties. 3M wrongfully and fraudulently concealed material facts regarding Lava Ultimate. Plaintiffs and the Class were therefore induced to purchase the product under false and/or fraudulent pretenses.

43634

706.    Because of 3M's breach of express warranties as set forth herein, Plaintiffs and the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Class of the purchase of all Lava Ultimate products currently owned, and for such other incidental and consequential damages as allowed.

707.    As a direct and proximate result of 3M's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**Count III.    Breach of Implied Warranty (Wash. Rev. Code § 62A.2-314)**

708.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Washington Class.

709.    3M is and was at all relevant times a "merchant" with respect to Lava Ultimate under Wash. Rev. Code § 62A.2-104(1) and a "seller" of Lava Ultimate under § Wash. Rev. Code § 62A.2-103.

710.    Lava Ultimate products were at all relevant times "goods" under § 62A.2-105(1).

711.    A warranty that Lava Ultimate was in merchantable condition and fit for the ordinary purpose for which dental restorations are used is implied by law pursuant to Wash. Rev. Code § 62A.2-314.

712.    Lava Ultimate, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use in a dental crown. Specifically, Lava

43634

233

Ultimate is inherently defective because it debonds at an unreasonably high rate, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs and the Class.

713.    3M was provided notice of these issues by numerous complaints filed against it, including the instant complaint. The numerous individual letters and communications sent by Plaintiffs and the Class after experiencing and suffering the corresponding damages from Lava Ultimate's failure provided 3M with pre-suit notice within a reasonable time of realizing the product's defects. Instead of repeating the specific notice allegations in this paragraph, Plaintiffs and the Class incorporate by reference the examples of notice detailed in the "Parties" section, which specifically describes the class representatives' experience with Lava Ultimate, including the pre-suit notice they provided to 3M. Alternatively, Plaintiffs were excused from providing notice.

714.    Allowing 3M additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here. 3M has already conceded that Lava Ultimate debonds at an unacceptable rate for crowns and no longer should be used for crowns. 3M's admissions are proof that the product fails in its essential purpose because 3M cannot meet the promise or repair the crowns.

715.    As a direct and proximate result of 3M's breach of the implied warranty of merchantability and fitness, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

43634

**Count IV.     Unjust Enrichment**

716.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Washington Class.

717.    3M has benefitted from selling defective Lava Ultimate products, whose value was artificially inflated by 3M's concealment of the high rates of debonds when used in crowns. Accordingly, 3M has been unjustly enriched at the expense of Plaintiffs and the Class.

718.    3M has received and retained unjust benefits from the Plaintiffs and class, and an inequity has resulted.

719.    It is inequitable and unconscionable for 3M to retain these benefits. Because 3M concealed its fraud and deception, Plaintiffs and the class were not aware of the true facts concerning Lava Ultimate and certainly did not benefit from 3M's misconduct.

**Count V.      Fraud**

720.    Plaintiffs re-allege and incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs bring this claim on behalf of the Washington Class.

721.    As discussed throughout this complaint, 3M misrepresented and concealed and/or suppressed material facts about the Lava Ultimate crowns and suitability for crowns. 3M engaged in this conduct with the intent to induce Plaintiffs and the Class to purchase Lava Ultimate for purposes that it was not suited or at a price that did not match the product's true value.

722.    Plaintiffs and the Class were unaware of these misrepresented and omitted material facts and would not have acted as they did if they had known of the misrepresented

43634

and/or concealed facts. Such misrepresentations and omissions caused Plaintiffs and the Class to purchase Lava Ultimate. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased the products, would not have purchased the products at the prices they paid, and/or would have purchased less expensive alternative restoration materials that did not contain the defect and which did not debond at an unacceptable high rate. Plaintiffs and the Class were justified in their reliance, in part, because 3M had exclusive control of such facts, which were not known to the public or the class members. 3M's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich 3M.

723.    Plaintiffs and the Class suffered damages and injuries due to 3M's material misrepresentations and omissions, which this complaint detailed with specificity in the factual allegations section. Plaintiffs incorporate those specified injuries and damages by reference here.

724.    3M's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the class members, respectfully request:

A.    An order determining this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure

43634

and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.     An order designating Plaintiffs as representatives of the Class and appointing their counsel as Class Counsel;

C.     Judgment temporarily and permanently enjoining 3M from continuing the unlawful, deceptive, fraudulent, harmful and unfair business conduct and practices alleged in this complaint;

D.     Judgment temporarily and permanently enjoining 3M from continuing to sell, market or distribute Lava products for use in crowns;

E.     Judgment against 3M in favor of Plaintiffs and the class members;

F.     Any and all applicable statutory and civil penalties;

G.     An order requiring 3M to pay both pre- and post-judgment interest on any amounts awarded;

H.     An award of costs and attorneys' fees, as allowed by law;

I.     Leave to amend this Complaint to conform to the evidence; and

J.     Such other or further relief as the Court may deem appropriate, just, and equitable.

43634

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a jury trial on all matters so triable.

Dated: January 4, 2017

Respectfully submitted,

s/ Daniel C. Hedlund
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Amanda M. Williams (#341691)
David A. Goodwin (#386715)
Eric S. Taubel (#0392491)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail:   dgustafson@gustafsongluek.com
          dhedlund@gustafsongluek.com
          awilliams@gustafsongluek.com
          dgoodwin@gustafsongluek.com
          etaubel@gustafsongluek.com

Warren T. Burns (*Admitted Pro Hac Vice*)
(TX State Bar No. 24053119)
Will Thompson (*Admitted Pro Hac Vice*)
(TX State Bar No. 24094981)
**BURNS CHAREST LLP**
500 North Akard Street, Suite 2810
Dallas, TX 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
E-mail:   wburns@burnscharest.com
          wthompson@burnscharest.com

43634

Korey A. Nelson (*Admitted Pro Hac Vice)*
(LA State Bar No. 30002)
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
E-mail:   knelson@burnscharest.com

***Plaintiffs' Interim Co-Lead Counsel***


James J. Pizzirusso (*Admitted Pro Hac Vice*)
(VA #47296)
**HAUSFELD LLP**
1700 K Street, NW
Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
E-mail:   jpizzirusso@hausfeldllp.com

Charles Gabriel (*Admitted Pro Hac Vice*)
(GA # 281649)
**CHALMERS PAK BURCH & ADAMS
LLC**
5755 North Point Parkway, Suite 96
Alpharetta, GA 30097
Telephone: (678) 735-5903
Facsimile: (678) 735-5905
E-mail:   cdgabriel@cpblawgroup.com

Edward A. Wallace (*Admitted Pro Hac Vice*)
(IL #6230475)
**WEXLER WALLACE LLP**
55 West Monroe St.
Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
E-mail:   eaw@wexlerwallace.com

43634

Brian Gudmundson (#336695)
Bryce D. Riddle (#398019)
**ZIMMERMAN REED, LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
E-mail:     brian.gudmundson@zimmreed.com
                bryce.riddle@zimmreed.com

Joseph G. Sauder (*Pro Hac Vice forthcoming*)
(PA #82467)
**MCCUNE WRIGHT LLP**
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
E-mail:     josephsauder@chimicles.com

Yvonne M. Flaherty (#267600)
**LOCKRIDGE GRINDAL NAUEN PLLC**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail:     ymflaherty@locklaw.com

Paul J. Scarlato (*Admitted Pro Hac Vice*)
(PA # 47155)
**GOLDMAN SCARLATO & PENNY PC**
8 Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Telephone: (484) 342-0700
E-mail:     scarlato@lawgsp.com

43634

William M. Audet (*Admitted Pro Hac Vice*)
(CA # 117456)
**AUDET & PARTNERS, LLP**
711 Van Ness Ave., Suite 500
San Francisco, CA 94102
Telephone: (415) 568-2555
Facsimile: (415) 568-2556
E-mail:   waudet@audetlaw.com

Jordan M. Lewis (MN #0203099, FL #97997)
**JORDAN LEWIS, P.A.**
4473 N.E. 11th Avenue
Fort Lauderdale, FL 33334
Telephone: (954) 616-8995
E-mail:   jordan@jml-lawfirm.com

*Plaintiffs' Executive Committee*

Katrina Carroll
Kyle A. Shamberg
**LITE DEPALMA GREENBERG, LLC**
211 West Wacker Drive
Suite 500
Chicago, IL 60606
Telephone: (312) 750-1265
E-mail:   kcarroll@litedepalma.com
          kshamberg@litedepalma.com

Garrett D. Blanchfield (#209855)
Roberta A. Yard (#322295)
**REINHARDT WENDORF &
BLANCHFIELD**
E-1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100
E-mail:   g.blanchfield@rwblawfirm.com
          r.yard@rwblawfirm.com

43634

John R. Parker, Jr.
**CUTTER LAW P.C.**
401 Watt Avenue,
Sacramento, CA 95864
Telephone: (916) 290-9400
E-mail:   jparker@cutterlaw.com

Alan L. Rosca
**PEIFFER ROSCA WOLF
ABDULLAH CARR & KANE**
A Professional Law Corporation
1422 Euclid Avenue, Suite 1610
Cleveland, Ohio 44115
Telephone: (216) 589-9280
E-mail:   arosca@prwlegal.com

Michael K. Yarnoff
**THE KEHOE LAW FIRM**
2 Penn Center, Suite 1020
1500 JFK Blvd.
Philadelphia, PA 19102
Telephone: (215) 792-6676
E-mail:   myarnoff@kehoelawfirm.com

Bryan L. Bleichner (MN 0326689)
Jeffrey D. Bores (MN 227699)
**CHESTNUT CAMBRONNE PA**
17 Washington Avenue North, Suite 300
Minneapolis, MN 55401
Telephone: (612) 339-7300
E-mail:   bbleichner@chestnutcambronne.com
            jbores@chestnutcambronne.com

Marc H. Edelson, Esq.
**EDELSON & ASSOCIATES, LLC**
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (215) 867-2399
E-mail:   medelson@edelson-law.com

*Attorneys for Plaintiffs' and the Putative Class*

43634

242